Cordelia **KELSEY**, infant, by her parent, Louise Kelsey, et al., Appellants,

v.

Caspar W. **WEINBERGER**, Individually and as Secretary of Health, Education and Welfare, et al.

No. 73–1960.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 1973.

Decided May 14, 1974.

Joseph L. Rauh, Jr., Washington, D. C., with whom John Silard, Elliott C. Lichtman, Washington, D. C., Daniel H. Pollitt, Chapel Hill, N. C. and James M. Nabrit, III, New York City, were on the briefs, for appellants.

Michael H. Stein, Atty., Dept. of Justice, with whom Irving Jaffe, Deputy Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, and Kathryn H. Baldwin, Atty., Dept. of Justice, were on the brief for appellee. Robert M. Werdig, Jr., and Garey G. Stark, Asst. U. S. Attys., also entered appearances for appellee.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

**SPOTTSWOOD W. ROBINSON, III,** Circuit Judge:

Cordelia Kelsey and other public school children, the appellants, complained in the District Court that the Secretary of Health, Education and Welfare, the principal appellee,[1] violated the Emergency School Aid Act[2] in promulgating a new regulation enabling proposed waivers of the ineligibility, under prior regulations, of five public school districts without first requiring the elimination of the effects of racially motivated teacher assignments theretofore made in those districts. The Secretary asserts that the Act permits him to grant the waivers because the districts have ceased discriminatory assignments and have adopted plans to remove the effects of past discrimination by the beginning of the 1975–76 school year. On cross-motions for summary judgment, the District Court ruled in appellees' favor and dismissed appellants' action.[3] We reverse and remand the case to the District Court with directions to enter an appropriate judgment in appellants' favor.

I

The salient facts of the case are not materially in dispute. On June 23, 1972, Congress passed the Emergency School Aid Act as Title VII of the Education Amendments of 1972.[4] One purpose of the Act, Congress declared, is the provision of financial assistance to local educational agencies "to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools. . . ."[5] The Act accordingly makes funds available for a variety of enumerated activities related to its stated objectives.[6] The Act also sets forth standards for determining eligibility for assistance[7] and criteria for evaluating applications therefor;[8] and it specifically requires a finding of ineligibility as to any school district which after June 23, 1972, indulged in one or more prohibited practices,[9] including the following:

No educational agency shall be eligible for assistance under [the Act] if it has, after June 23, 1972— . . . engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency. . . .[10]

The Act contains, however, a proviso enabling an ineligible agency to apply to the Secretary for a waiver of ineligibil-

1. The other appellee is the Assistant Secretary of Health, Education and Welfare for Education.

2. Pub.L.No.92–318, tit. VII, §§ 701–720, 86 Stat. 354 (1972), 20 U.S.C. §§ 1601–1619 (Supp. II 1972).

3. Kelsey v. Weinberger, 363 F.Supp. 521 (D.D.C.1973).

4. Pub.L.No.92–318, tit. VII, §§ 701–720, 86 Stat. 354 (1972), 20 U.S.C. §§ 1601–1619 (Supp. II 1972).

5. In § 702 of the Act, 20 U.S.C. § 1601 (Supp. II 1972), Congress stated:

(a) The Congress finds that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access.

(b) The purpose of this chapter is to provide financial assistance—

(1) to meet the special needs incident to the elimination of minority group segregation and discrimination among students

and faculty in elementary and secondary schools;

(2) to encourage the voluntary elimination, reduction, or prevention of minority group isolation in elementary and secondary schools with substantial proportions of minority group students; and

(3) to aid school children in overcoming the educational disadvantages of minority group isolation.

6. Emergency School Aid Act §§ 707–709, 711, 20 U.S.C. §§ 1606–1608, 1610 (Supp. II 1972); H.R.Rep.No.92–576, 92nd Cong., 1st Sess. 5 (1971).

7. Emergency School Aid Act § 706(a)(1), 20 U.S.C. § 1605(a)(1) (Supp. II 1972).

8. Emergency School Aid Act 710(c), 20 U.S. C. § 1609(c) (Supp. II 1972).

9. Emergency School Aid Act § 706(d)(1)(A)–(D), 20 U.S.C. § 1605(d)(1)(A)–(D) (Supp. II 1972).

10. Emergency School Aid Act § 706(d)(1)(B), 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972).

ity.[11] But the granting of a waiver is statutorily conditioned upon a

> determination that any practice, policy, procedure or other activity resulting in ineligibility has ceased to exist, and that the applicant has given satisfactory assurance that the activities prohibited in [the subsection defining ineligibility] will not reoccur.[12]

The Act similarly instructs the Secretary to promulgate waiver regulations which "insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur. . . ."[13]

On February 6, 1973, the Secretary first issued regulations implementing the provisions of the Act.[14] In their original text, the regulations clearly blocked access to the Act's assistance by any public school system pursuing, after June 23, 1972, a practice leading to racial discrimination in the deployment of teachers in its schools. The regulations flatly stated that

> No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any . . . practice, policy or procedure which results in discrimination on the basis of race, color, or national origin . . . in the assignment of any of its employees . . . including full time classroom teachers to the schools of such agency in such a manner as to identify any such schools as intended for students of a particular race or national origin.[15]

The regulations also insisted that where ineligibility followed a discriminatory assignment of teachers, an "application for waiver shall contain evidence that such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color or national origin."[16] A further limitation imposed by the regulations was that agencies not implementing a judicial or administrative order relating to faculty assignment reassign teachers "so that the proportion of minority group full-time classroom teachers at each school is between 75 percentum and 125 percentum of the proportion of such minority group teachers which exists on the faculty as a whole, and so that the variations in such proportions which remain on various faculties do not correspond to such variations in the student populations of such schools."[17] As appellees admit, under the original regulations "a school which had in the past made discriminatory assignments was required not only to stop such assignments, but to correct the effect of past discriminatory assignments by reassigning, prior to approval of the waiver, all of its teachers in such a way that the racial identifiability of schools resulting from assignments of the preceding years would be completely corrected."[18]

While the original regulations were in vogue, a host of school districts qualified for financial aid under the Act. The Secretary found a small number [19] ineli-

---

11. The proviso reads as follows:
    [S]uch agency may make application for a waiver of ineligibility, which application shall specify the reason for its ineligibility, contain such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur and include such provisions as are necessary to insure that such activities do not reoccur after the submission of the application.
    Emergency School Aid Act § 706(d)(1), 20 U.S.C. § 1605(d)(1) (Supp. II 1972).

12. Emergency School Aid Act § 706(d)(3), 20 U.S.C. § 1605(d)(3) (Supp. II 1972).

13. Emergency School Aid Act § 706(d)(1), 20 U.S.C. § 1605(d)(1) (Supp. II 1972).

14. 38 Fed.Reg. 3450–71, 45 C.F.R. pt. 185 (1973).

15. 38 Fed.Reg. 3462, 45 C.F.R. § 185.43(b)(2) (1973).

16. 38 Fed.Reg. 3463, 45 C.F.R. § 185.44(d)(3) (1973).

17. Id.

18. Statement of Peter E. Holmes, Director, Office of Civil Rights, Department of Health, Education and Welfare, J.App. 38.

19. Among the ineligibles were Baltimore, Detroit, Los Angeles, Rochester, and Richmond (California), the five cities upon which this

gible to receive funds for fiscal year 1973 because of the racial identifiability of faculties in their schools—a reflection of racially inspired assignments of teachers.

On June 29, 1973, the Secretary issued a press release announcing his intention to reexamine the regulations with a view toward softening the restrictive elements of the waiver provision in order to allow for more "realistic" funding of programs in previously ineligible communities. On July 16, the Secretary issued a notice of proposed rulemaking envisoning modification of the rule pertaining to waivers of ineligibility consequent upon discrimination in faculty assignments.[20] The crux of the proposed revision was a new regulation permitting approval of an application for a waiver in favor of a previously ineligible school district even though the effects of such discrimination had not been fully rectified.[21] The new regulation would demand a showing that the educational agency had adopted a policy of racially nondiscriminatory faculty assignments and would make all future assignments in such manner that racial identifiability of faculties would not increase.[22] The regulation would, however, allow the agency to continue one-race faculties for one year and racially identifiable faculties for two years.[23] The regulation would also eliminate the administrative definition of a racially identifiable faculty [24] without provision of any substitute. Despite vigorous opposition by civil rights groups, the new regulation was promulgated without change on August 9, 1973, clearing the way for five cities to seek waivers of their prior ineligible status soon after the effective date of August 16, 1973.[25]

The five cities promptly filed applications for waiver.[26] The submissions re-

---

litigation centers. Richmond withdrew its application for waiver, while the case was before the District Court, and apparently it has not since reapplied.

20. 38 Fed.Reg. 18899, 45 C.F.R. § 185.44(d) (3) (1973).

21. The new regulation reads:
  (3) In the case of ineligibility resulting from discriminatory assignment of teachers as prohibited by § 185.43(b)(2), such applications for waiver shall contain evidence that such agency has adopted and implemented a nondiscriminatory assignment policy. In the case of a local educational agency implementing a plan . . . [of desegregation], such evidence shall indicate that such agency is complying with the requirements of such plan with respect to the assignment of faculty. In the case of local educational agencies not implementing such a plan, or implementing such a plan which contains no provision as to assignment of faculty, such evidence shall include at a minimum:
  (i) Adoption by such agency of a policy of nondiscriminatory assignment of faculty and staff members;
  (ii) Determination of all faculty and staff assignments made after the date of application for waiver in a manner which does not contribute to or reinforce the racial or ethnic identifiability of any school operated by such agency;
  (iii) Adoption of a plan to eliminate all full-time teaching facilities composed exclusively of members of a single racial or ethnic group no later than the end of the period for which assistance is to be awarded; and
  (iv) Adoption of a plan for assignment of faculty and staff members which will eliminate all racially or ethnically identifiable faculties at schools operated by such agency within a reasonable period of time but in no event later than the commencement of the 1975-76 academic year. In the case of school districts in which the percentage of minority group members on the full-time teaching faculty is less than the percentage of minority group members in the student body, such plans shall include a plan of affirmative action to increase the percentage of minority group members on the full-time teaching faculty of such agency.
38 Fed.Reg. 21646, 45 C.F.R. § 185.44(d) (3) (1973).

22. 45 C.F.R. § 185.44(d)(3)(i), (ii) (1973), quoted *supra* note 21.

23. 45 C.F.R. § 185.44(d)(3)(iii), (iv) (1973), quoted *supra* note 21.

24. See text *supra* at note 17.

25. The application of a sixth city, Chicago, Illinois, was denied because a binding collective bargaining agreement precluding involuntary teacher-transfers prior to the fall of 1976 disabled the city from meeting the regulation's two-year deadline for eliminating racial identifiability of faculties.

26. The five cities are identified in note 19, *supra*.

veal that none of the cities offers to undertake any involuntary redistribution of teachers presently assigned on a racial basis. Rather, they propose to rely on the gradual though inevitable process of teacher attrition to create vacancies, and upon nondiscriminatory appointment and assignment of new teachers as a means of reducing prohibited racial concentrations within the two-year time frame of the regulation. In short, instead of altering faculty setups ensuing from racially induced faculty assignments in the past, the cities will continue those assignments in effect, subject to change only by the filling of vacancies on a nonracial basis.

On August 16, 1973, the effective date of the revised waiver regulation, the Secretary, as required by the Act,[27] transmitted to statutorily designated congressional committees[28] notices of intent to grant waivers of ineligibility to the five cities. This litigation challenges the validity of the new regulation in relation to the waivers contemplated. Appellants, minority group children attending public schools in three of the five affected cities, sought in the District Court a declaration that the current regulation is invalid and an injunction restraining the grant of the waivers. Hearing the case on cross-motions for summary judgment, the court entered

judgment upholding appellees on the merits and dismissing appellants' action,[29] and this appeal followed.

## II

■   The Emergency School Aid Act is explicit in its stipulation that "[n]o educational agency shall be eligible for assistance" under its provisions if after June 25, 1972, the date of its enactment, the agency has "engaged in discrimination based upon race, color, or national origin in the . . . assignment of [its] employees. . . ."[30] Thus the Act prohibits financial aid to any educational agency which continued to utilize a racial factor in the deployment of teachers in the schools under its jurisdiction. The record leaves no alternative to the conclusion on this appeal that each of the applicant agencies was ineligible for statutory benefits because of racially discriminatory assignments of faculty personnel in its school system after the Act went into effect.[31]

■   To be sure, the Act authorizes the Secretary to waive an agency's ineligibility, but only upon a "determination that any practice, policy, procedure, or other activity resulting in ineligibility *has ceased to exist*, [or occur] and that the applicant has given satisfactory assurance that the activities prohibited . . . will not reoccur."[32] It goes

27. Emergency School Aid Act § 706(d)(6), 20 U.S.C. § 1605(d)(6) (Supp. II 1972).

28. The Committee on Labor and Public Welfare of the Senate and the Committee on Education and Labor of the House of Representatives. *Id.*

29. Kelsey v. Weinberger, *supra* note 3.

30. Emergency School Aid Act § 706(d)(1)(B), 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972).

31. Appellants so allege, and appellees do not deny. Appellees do argue that racial identifiability of faculties, standing alone, does not demonstrate racial discrimination within the meaning of the Act, but we are satisfied that that point must fail. A prima facie case of unconstitutional discrimination exists where it is possible to identify a "white school" or a "black school" simply by reference to the racial composition of its teachers

and staff. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Comm'rs, 402 U.S. 33, 35, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 236, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Green v. County School Bd., 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Bradley v. School Bd., 382 U.S. 103, 105, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). Moreover, appellees themselves originally rejected the cities' applications for assistance on the ground that the effects of racially induced teacher assignments persisted. And in any event, since the District Court disposed of the case by summary judgment, appellants are entitled to a trial on the issue if material.

32. Emergency School Aid Act § 706(d)(3), 20 U.S.C. § 1605(d)(3) (Supp. II 1972) (emphasis supplied).

without saying that the Secretary is powerless to waive ineligibility on terms other than those which the Act undertakes to confer. One of the statutory standards by which the validity of administrative waivers of ineligibility must be measured thus emerges from Congress' use of the phrase "has ceased to exist" in its grant of waiver authority to the Secretary.

So it is that we are brought to the central question in this case: whether the Act permits the Secretary to waive the ineligibility of an educational agency flowing from a practice of racially inspired teacher assignments where the agency has discontinued the practice for the future but has not yet rectified discriminatory assignments made in the past. Appellants contend that the Act conditions waivers of ineligibility upon elimination of the effects of past discrimination, as well as upon nondiscrimination in the present and the future, because otherwise the forbidden "practice . . . resulting in ineligibility"

has not "ceased to exist." Appellees argue, on the other hand, that once the practice has been halted it has "ceased to exist," and that the effects of previous discrimination may then be gradually erased over a reasonable period of time, as allowed by the Secretary's current waiver regulation.[33]

The District Court was of the opinion, and we agree, that the language of the Act conferring the waiver authority is susceptible to either construction.[34] And like the District Court,[35] we are unable to find any source extrinsic to the Act from which we might derive a significant clue as to the meaning properly to be ascribed to the waiver provision. The parties have cited no case interpreting that provision, nor have we found any, and our examination of its legislative history has uncovered nothing really helpful.[36] But the interpretation which appellees urge treads dangerously close to constitutional condemnation of a part of the Act and, unlike the District Court, we feel obliged to resort to rele-

33. See note 21, *supra*.

34. Kelsey v. Weinberger, *supra* note 3, 363 F.Supp. at 524.

35. *Id.*

36. Both sides refer to legislative history but we find nothing in the committee reports or the floor debates which would resolve the conflicting interpretations they give to the statutory phrase "ceased to exist." So barren is the historical material that we are constrained to pause only for a single comment in regard to it.

Appellees call attention to a colloquy during debate in the House of Representatives, 117 Cong.Rec. 39332–33 (1971), as evidence that the language in question was not intended to adopt one of the holdings in Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir.), rev'd in part, sub nom., Carter v. West Feliciana Parish School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), wherein the Fifth Circuit announced a substantive standard for dismantling racially identifiable faculties in a dual school system. *Id.* at 1217–1218. The Court required the involved school district to reassign teaching staffs to produce a ratio of minority to majority-group personnel on the faculty in each school substantially equivalent to the ratio of the groups in the system as a whole, *id.* at 1218, and directed the district to make involuntary transfers of faculty members if necessary. *Id.* The Court also reiterated the obligation of every school in the district to terminate duality at once and to hereafter operate unitary schools only. *Id.* at 1216–1217.

The colloquy to which appellees refer—between Congressmen Pucinski, Waggoner and Esch—is wholly unrelated to the statutory language we are summoned to interpret. It was precipitated by an inquiry as to whether "perfect racial balance in the faculty in every single school would be required" 117 Cong.Rec. 39332 (1971)—a question of the degree of faculty balance, an important element of the *Singleton* decision. See 419 F. 2d at 1216–1217. Moreover, the underlying assumption upon which the exchange proceeded was uncontested, namely, that the faculties must be desegregated. In the case at bar, however, battle is joined over whether the Secretary may allow school districts to continue discriminatory teacher assignments over a two-year period, and the constructional problem centers on the time at which faculty desegregation must occur rather than the degree of desegregation demanded. The colloquy does not touch the element of immediacy which constituted another important component of the *Singleton* decision.

vant canons of statutory construction for the solution of the perplexing problem confronting us.

■ It is firmly settled that, whenever possible, statutes are to be construed in a manner that not only upholds their constitutionality [37] but also steers clear of uncertainty on that score.[38] The Supreme Court has admonished that a statute "must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity,"[39] and has "favored that interpretation of legislation which gives it the greater chance of surviving the test of constitutionality." [40] So, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of a contrary legislative intent." [41]

Appellees' reading of the Act's waiver provision as a license to fund school districts in which the evils of discriminatory teacher assignments remain uneradicated generates concern of constitutional proportions. As the District Court put it mildly, appellants' constitutional arguments precipitated by appellees'

construction are "undoubtedly of great force." [42] We think that construction unwarrantedly exposes the Act to a severe risk of "danger of unconstitutionality," [43] and for that reason must be shunned.

## III

In its *Brown I* [44] and *Bolling* [45] decisions in 1954, the Supreme Court held that racial segregation governmentally required or authorized in public education is at war with the Federal Constitution. In *Brown II* [46] decided the following year, the Court gave unmistakable notice that every educational agency operating racially separate public schools must "effectuate a transition to a racially nondiscriminatory school system." [47] Indubitably, "[t]he transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." [48]

■ Public school authorities operating segregated facilities thus were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." [49] And

37. United States v. Vuitch, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); United States v. National Dairy Prods. Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1922).

38. Lynch v. Overholser, 369 U.S. 705, 710–711, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); International Ass'n of Machinists v. Street, 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); United States v. Harriss, 347 U.S. 612, 618 n. 6, 74 S.Ct. 808, 98 L.Ed. 989 (1954); American Communications Ass'n v. Douds, 339 U.S. 382, 407, 70 S.Ct. 674, 94 L.Ed. 925 (1950); United States v. CIO, 335 U.S. 106, 120–121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948).

39. Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 428, 73 L.Ed. 851 (1929).

40. Ex parte Endo, 323 U.S. 283, 299, 65 S.Ct. 208, 217, 89 L.Ed. 243 (1944). See also United States v. Rumely, 345 U.S. 41, 46, 73 S.Ct. 543, 97 L.Ed. 770 (1947).

41. United States v. Thompson, 147 U.S.App. D.C. 1, 5, 452 F.2d 1333, 1337 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed. 467 (1972).

42. Kelsey v. Weinberger, *supra* note 3, 363 F.Supp. at 525.

43. See United States v. Harriss, *supra* note 38, 347 U.S. at 618 n. 6; American Communications Ass'n v. Douds, *supra* note 38, 339 U.S. at 407; United States v. CIO, *supra* note 38, 335 U.S. at 121.

44. Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

45. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

46. Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

47. *Id.* at 301.

48. Green v. County School Bd., *supra* note 31, 391 U.S. at 436.

49. *Id.* at 437–438. Accord, Keyes v. School Dist. No. 1, 413 U.S. 189, 200, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Swann v.

"[t]he objective today remains to eliminate from the public schools all vestiges of state-imposed segregation."[50] It cannot be doubted that both the duty and the objective embrace faculty setups resulting from assignments based on considerations of color; *Brown II* so indicated,[51] and subsequent decisions have made that the plainer. Duality of schools may appear "simply by reference to the racial composition of teachers and staff,"[52] and "[w]hen a system has been dual in [this] respect [,] the first remedial responsibility of school authorities is to eliminate invidious racial distinctions."[53]

Nor can it be doubted that when, in 1973, the Secretary fashioned his revised waiver regulation, time for any reconstitution of faculty demanded by the *Brown I–Bolling* holding had long since expired. In *Brown II* in 1955, the Court directed that the steps necessary to implement that holding be taken "with all deliberate speed."[54] While *Brown II* "contemplated the possible need of some limited delay in effecting total desegregation of public schools,"[55] it "never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools. . . ."[56] So in 1964 the Court emphasized that "[t]he time for mere 'deliberate speed' has run out,"[57] and in 1965 that "[d]elays in desegregating school systems are no longer tolerable."[58] And in 1969, almost four years before the Secretary's revised regulation was promulgated, the Court declared that "the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools."[59] Yet as we approach the twentieth anniversary of *Brown I* and *Bolling*, the Secretary's new regulation would indulge noncomplying school districts even more time for faculty desegregation.

■■ Additionally, and very plainly, the Secretary's revised regulation opens the door to federal financial contributions in situations wherein local educational agencies have defaulted in the discharge of their faculty desegregation responsibilities. It cannot be gainsaid that "[a] State's constitutional obligation requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination."[60] Nor can it be dis-

---

Charlotte-Mecklenburg Bd. of Educ., *supra* note 31, 402 U.S. at 15; Alexander v. Holmes County Bd. of Educ., 396 U.S. 19, 20–21, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

50. Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra* note 31, 402 U.S. at 15.

5I. "[P]roblems related to . . . personnel" were among those specifically earmarked in *Brown II* for early attention by school authorities. Brown v. Board of Educ., *supra* note 46, 349 U.S. at 300–301.

52. Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra* note 31, 402 U.S. at 18.

53. *Id.*

54. Brown v. Board of Educ., *supra* note 46, 349 U.S. at 301.

55. Watson v. City of Memphis, 373 U.S. 526, 529, 83 S.Ct. 1314, 1316, 10 L.Ed.2d 529 (1963).

56. *Id.* at 530. Accord, Calhoun v. Latimer, 377 U.S. 263, 264–265, 84 S.Ct. 1235, 12 L. Ed.2d 288 (1964); Goss v. Board of Educ.,

373 U.S. 683, 689, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).

57. Griffin v. County School Bd., 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964).

58. Bradley v. School Bd., *supra* note 31, 382 U.S. at 105 (emphasis supplied). Accord, Green v. County School Bd., *supra* note 31, 391 U.S. at 438–439; Rogers v. Paul, 382 U.S. 198, 199, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965).

59. Alexander v. Holmes County Bd. of Educ., *supra* note 49, 396 U.S. at 20 (emphasis supplied). Accord, Dowell v. Bd. of Educ., 396 U.S. 269, 270, 90 S.Ct. 415, 24 L.Ed.2d 414 (1969). See also Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra*, note 31, 402 U.S. at 13–14.

60. Norwood v. Harrison, 413 U.S. 455, 467, 93 S.Ct. 2804, 2812, 37 L.Ed.2d 723 (1973). Accord, Griffin v. County School Bd., *supra* note 57, 377 U.S. at 231–232; Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.

puted that "[s]tate support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws." [61] Certainly the Fifth Amendment does not tolerate the Federal Government in an involvement with racially segregated education which the Fourteenth prohibits to the states.[62] On the contrary, this court *en banc* has already recognized and enforced the Secretary's "general obligation not to allow federal funds to be supportive of illegal discrimination." [63]

▮ We point to this array of constitutional principles, not as a predicate for actually passing on the validity of the Act's waiver section, but as an identification of grave difficulties which inexorably it would encounter if· given the interpretation for which the Secretary contends. And it is clear enough that unless the Act is to be exposed to the perils which these principles make evident, the Secretary's revised waiver regulation cannot stand. While the regulation in original form called for hard evidence of completely desegregated faculties as a precondition to funding under the Act,[64] the new regulation envisions funding although illegal faculty segregation may continue. Moreover, the new regulation could be met notwithstanding postponement of the date of completion for as long as two years [65]—and, concomitantly, perpetuation of the impact of racially identifiable schools over that period.[66] Furthermore, since neither the new regulation nor the agencies' applications in this case propose affirmative action in the form of involuntary teacher transfers, school systems conceivably could maintain a segregated faculty status through the 1974–75 academic year and still, by prompt faculty desegregation, qualify for uninterrupted assistance under the Act.[67] By placing a two-year limit on faculty segregation, the Secretary acknowledges his obligation to require faculty desegregation, but he fails to recognize that the time for performance of desegregation responsibilities is now.[68]

▮ In the District Court, appellants attacked the validity of the revised waiver regulation on grounds not only that it was inconsistent with the statutory provision on waiver but also that it could not pass muster under the Fifth Amendment. The District Court felt that the constitutional argument was "undoubtedly of great force," [69] but nonetheless construed the Act as a source of administrative authority to fund projects in school districts wherein faculty desegregation is a promised but unrealized goal. The court reasoned that since "the clear intent of the statute is that federal funds be available to meet the needs incident to the process of desegregation[,] [t]hat language implies that funds will be expended to carry out an ongoing implementation of a desegregation program." [70] The court concluded that "[t]o require that the result as well as the practice be eliminated before a waiver could be granted would be anomalous indeed in the face of the congressional finding that local school dis-

---

Ed.2d 5 (1958) ; Hall v. St. Helena Parish School Bd., 197 F.Supp. 649, 653–656 (E.D. La.1961), aff'd, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962).

61. Cooper v. Aaron, *supra* note 60, 358 U.S. at 19.

62. Bolling v. Sharpe, *supra* note 45, 347 U.S. at 499–500.

63. Adams v. Richardson, 156 U.S.App.D.C. 267, 274, 480 F.2d 1159, 1166 (*en banc* 1973).

64. See text *supra* at notes 16–18.

65. See note 21, *supra.*

66. See note 21, *supra.*

67. See note 21, *supra.*

68. See text *supra* at notes 54–59.

69. Kelsey v. Weinberger, *supra* note 3, 363 F.Supp. at 525.

70. *Id.* at 524.

tricts lack the funds to implement plans of desegregation." [71]

We find ourselves in disagreement with the District Court on both counts. While surely the pervading purpose of the Act is to financially assist a worthy desegregation plan, the Act makes monies available, not for the basic desegregation activities themselves, but for auxiliary programs designed to enhance the success of the desegregation effort and to ameliorate the inroads of past educational segregation.[72] We find no provision in the Act licensing expenditures simply for the purpose of reassigning teachers; [73] indeed, on oral argument appellees' counsel conceded that teacher-reassignment is an administrative task [74] devoid of any incidental financial output. Judges before us have perceived no impediment to immediate faculty desegregation,[75] and nothing coming to our attention reflects congressional concern in that regard. Even should one surmise that Congress intended to contribute from the public fisc to school districts still indulging segregated faculties, at least a substantial doubt as to whether it could validly do so remains.[76]

## IV

■ We conclude that racially identifiable public school faculties as well as policies and practices of racially discriminatory teacher assignments must have "ceased to exist" prior to any administrative waiver of ineligibility for benefits under the Act. We are persuaded to that construction of the Act's authorizing provision for three major reasons. First, that interpretation of the language of a statute designed to assist desegregation appeals to us as logically sounder than an alternative which would foster continuance of the debilitating effects of past segregatory policy. Second, the Supreme Court's constitutional decisions virtually mandate adherence to a construction which insists upon immediate removal of the effects of educational discrimination based on race, particularly where federal funding is involved. And, third, we avoid the doubts which inevitably accompany an undue strain on the fiber of constitutional precedent by an interpretation calling both for present and future cessation of segregatory practices and prior elimination of the results of such practices before a waiver of ineligibility for federal aid is forthcoming.

The Secretary's revised waiver regulation does not harmonize with this construction of the governing statutory provision. It follows that neither the regulation, the proposed waivers nor the District Court's approving decision can be sustained. The judgment of the District

---

71. *Id.* at 525.

72. Programs which may qualify for assistance under the Act include those providing for remedial services, additional staff, training and retraining of staff, guidance and counseling, new curricula and instructional techniques, innovative interracial and pilot projects, community activities, special administrative and auxiliary services, planning activities, minor remodeling and alterations of facilities, educational television, and other specially designed projects. See Emergency School Aid Act §§ 707–709, 711, 20 U.S.C. §§ 1606–1608, 1610 (Supp. II 1972).

73. See Emergency School Aid Act §§ 707–709, 711, 20 U.S.C. §§ 1606–1608, 1610 (Supp. II 1972).

74. We may note that "faculty and staff desegregation . . . may not be made contingent upon the willingness of teachers voluntarily to transfer." Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501, 523 (C.D.Cal.1970). Accord, United States v. Greenwood Municipal Separate School Dist., 406 F.2d 1086, 1093–1094 (5th Cir. 1969); United States v. Board of Educ., 396 F.2d 44, 50–51 (5th Cir. 1968); Davis v. Board of Comm'rs, 393 F.2d 690, 695–698 (5th Cir. 1968), aff'd, 402 U.S. 33, 35, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); Monroe v. Commissioners of City of Jackson, 380 F.2d 955, 960 (6th Cir. 1967), rev'd on other grounds, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

75. See *e. g.*, Nesbit v. Statesville City Bd. of Educ., 418 F.2d 1040, 1042 (4th Cir. *en banc* 1969); Singleton v. Jackson Municipal Separate School Dist., *supra* note 36, 419 F.2d at 1217–1218; Booker v. Special School Dist. No. 1, 351 F.Supp. 799, 810 (D.Minn.1972).

76. See text *supra* at notes 60–63.

Court is accordingly reversed, and the case is remanded with instruction to award appellants the declaratory and injunctive relief sought by their complaint.

So ordered.