**Darryl W. BROWN et al., Plaintiffs,**

v.

**Joseph A. CALIFANO et al., Defendants.**

**Civ. A. No. 75–1068.**

United States District Court,
District of Columbia.

July 18, 1978.

Joseph L. Rauh, Jr., Rauh, Silard & Lichtman, Washington, D. C., for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Robert J. Franzinger, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

SIRICA, District Judge.

This civil rights action challenges, as violating the Constitution's equal protection guarantee, two recently-enacted statutory provisions that limit the means available to the federal government under Title VI of the Civil Rights Act of 1964, Pub.L.No.88–352, 78 Stat. 252, 42 U.S.C. § 2000d to d–6 (1970), to check racial discrimination in federally-supported schools. These provisions, known as the Esch[1] and the Eagleton-Biden Amendments,[2] basically prevent the Department of Health, Education and Welfare (HEW), the agency primarily charged with enforcing Title VI in the education area, from relying on Title VI to order the implementation of plans that require the busing of students to schools other than those closest to their residences. Prior to the enactment of the Esch and Eagleton-Biden Amendments, HEW had the authority under Title VI to require transportation remedies under the threat of cutting off federal funds to offending aid recipients. Plaintiffs, a group of public school students who attend schools that receive federal support, maintain that the Esch and Eagleton-Biden Amendments are unconstitutional because, on their face, they are desegregation-inhibiting measures that will inevitably bring the federal government into a position of having to support segregated educational systems. As will appear more fully below, plaintiffs' argument exaggerates the necessary effects these Amendments will have on the federal government's ability to carry out its constitutional obligations, and overlooks alternative means available to federal authorities other than HEW to effect transportation remedies when they are needed to achieve desegregation in federally-funded school districts.

Title VI of the 1964 Civil Rights Act broadly prohibits recipients of federal aid from engaging in discrimination based on race, color and national origin. In particular, section 601 of the Act declares "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimi-

---

1. The Esch Amendment was enacted as section 215(a) of the Equal Educational Opportunities Act of 1974, Pub.L.No.93–380, 88 Stat. 517, 20 U.S.C. §§ 1701–1721 (Supp. V 1975). Codified at 20 U.S.C. § 1714(a) (Supp. V 1975), it provides:

    No court, department, or agency of the United States shall . . . order the implementation of a plan that would require the transportation of any student to a school other than the school closest or next closest to his place of residence which provides the appropriate grade level and type of education for such student.

    Esch's broad language was narrowed, however, by another provision of the 1974 Act, 20 U.S.C. § 1702(b) (Supp. V 1975), which reads:

    . . . the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fairly the fifth and fourteenth amendments to the Constitution of the United States.

2. The Eagleton-Biden Amendment was enacted as part of Pub.L.No.95–205, 91 Stat. 1460 (December 9, 1977). It provides:

    None of the funds contained in this Act [HEW's appropriation] shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, in order to comply with Title VI of the Civil Rights Act of 1964. For the purposes of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.

nation under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (1970). This policy of non-discrimination is carried into effect by allowing "Each federal department and agency which is empowered to extend Federal financial assistance" to issue appropriate "rules, regulations or orders." 42 U.S.C. § 2000d–1 (1970). *See* 45 C.F.R. §§ 80.1–.13 (1977). In addition, "Compliance with any requirement adopted pursuant to this section may be effected by (1) termination of" the government funding "or (2) by any other means authorized by law." 42 U.S.C. § 2000d–1 (1970).

Enforcement of Title VI begins with the filing of assurances of compliance by subject recipients attesting to their willingness to comply with all statutory and regulatory requirements. 45 C.F.R. § 80.4 (1977). In the case of recipient elementary and secondary school systems, this obligation is discharged when recipients give adequate assurance that they will either comply with desegregation plans determined by responsible department officials to be adequate under statutory and regulatory guidelines, or abide by the terms of any court order if the school district is under court order to desegregate. *Id.,* § 80.4(c).

In the event that recipient school districts fail to make the necessary assurances, HEW is permitted to proceed against them but must first notify the offending recipient of the violation and undertake to work out a solution through voluntary means. 42 U.S.C. § 2000d–1 (1970); 45 C.F.R. §§ 80.-8(a) & (b) (1977). If efforts to achieve compliance through conciliation prove to be unavailing, HEW has two enforcement options. The first of these is a multi-step administrative process that culminates in a decision on fund termination after notice to terminate is given, a hearing is held before an examiner, review is conducted by an agency appeals authority and final review by the Secretary of HEW. 45 C.F.R. §§ 80.8–.10 (1977). The final agency decision is then reviewable in the courts. *Id.,* § 80.11; 42 U.S.C. § 2000d–2 (1970).

It is this administrative enforcement process that is affected by the Esch and Eagleton-Biden Amendments. As stated, these provisions operate to prevent HEW from enforcing Title VI so as to require the transportation of students to schools other than those closest to them. And since transportation solutions are often thought to be the necessary corrective action for violations of Title VI, the effect of the Amendments is to prevent HEW from ordering fund termination even though, in the agency's view, compliance with Title VI's mandate depends on busing.

There is, however, a second enforcement option. This alternative authorizes HEW to refer to the Department of Justice cases that evidence a violation of Title VI. In particular:

> If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by [fund termination] *or by* any other measure authorized by law. Such other means may include, but are not limited to (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking  .   .   . .

45 C.F.R. § 80.8(a) (1977) (emphasis supplied).

Upon referral, a number of enforcement methods are available. As enumerated in relevant Department of Justice regulations:

> Possibilities of judicial enforcement include (1) a suit to obtain specific enforcement of assurances, covenants running with federally provided property, statements [of] compliance or desegregation plans filed pursuant to agency regulations, (2) a suit to enforce compliance with other titles of the 1964 Act, other Civil Rights Acts or constitutional or statutory provisions requiring nondiscrimination, and (3) initiation of, or intervention

or other participation in, a suit for other relief designed to secure compliance.

28 C.F.R. § 50.3, Alt. I–B–1 (1977).

Significantly, nothing in the Esch and Eagleton-Biden Amendments prevents HEW from pursuing the referral alternative in cases where, in the agency's judgment, transportation remedies are warranted. As one of the sponsors of the Eagleton-Biden provision made clear,

HEW is authorized under Title VI to refer matters to the Department of Justice for litigation; this is the course that should be pursued if there is a decision to go forward in a case to which [this] amendment applies.

\*   \*   \*   \*   \*   \*

. . . we are not talking about a case in Federal court where the judge finds a violation of the Equal Protection Clause of the Constitution and enters a busing order to remedy such violation. [This] amendment would not apply in such a situation and I would not support a law which attempted to restrict the authority of federal courts to pass appropriate and targeted remedies to redress such constitutional violations. The [Eagleton-Biden] amendment does apply and I support its application to matters such as Kansas City where the HEW acting solely on its own administrative authority and acting without any judicial determination of unconstitutionality, administratively seeks to impose its own formula as the racial mix or racial balance of a given school district.

123 Cong.Rec. S 10898, 10917 (daily ed., June 28, 1977) (remarks of Sen. Eagleton). *See also id.,* S 10915–16 (daily ed., June 28, 1977) (remarks of Sen. Biden).

From the foregoing, it is clear that, if HEW administrators are of the view that the fund termination procedure is foreclosed in a given case because busing remedies are indicated, the option is available to have the matter referred to the Department of Justice for possible litigation. Despite the continued availability of this enforcement option, plaintiffs in this case challenge the Esch and Eagleton-Biden Amendments as impermissibly inhibiting desegregation and as operating to bring the federal government into a position of support for segregated education. In essence, plaintiffs' contention is that *HEW's* unimpaired ability to insure equality in education through fund termination is a constitutional necessity and that statutory adjustment in the *federal government's* overall enforcement scheme of the sort brought about by the two amendments in question is constitutionally impermissible. Defendants take just the opposite position. Defendants concede that, if the constitutionality of these amendments was properly tested on the basis of their wisdom as a matter of policy, there would be serious doubt concerning their lawfulness. However, defendants hasten to point out that the continued availability of the referral option as an enforcement technique represents a constitutionally adequate commitment on the federal government's part to Title VI's goal of achieving equality in federally-supported schools. In the Court's opinion, defendants' point is well taken.

At the outset, the Court must note plaintiffs' constitutional challenge is directed at the Esch and Eagleton-Biden Amendments *on their face.* Plaintiffs do not contend that the litigation option left untouched by these provisions is so unworkable and inadequate *as a matter of demonstrated fact* that it should be dismissed out of hand in assessing the constitutionality of Title VI's modified enforcement scheme. Nor could they given the fact that these amendments are of recent vintage and their impact on the government's overall ability to effect desegregated education has of necessity yet to be fully explored. Instead, plaintiffs read their worst fears into the two provisions and, on that basis, ask the Court to declare them unlawful regardless of what may actually come to pass.

Plaintiffs' principal line of attack focuses on the rule established by the Supreme Court in *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), to the effect that government-imposed prohibitions

against the transportation of students violate the equal protection guarantee when they operate "to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system." *Id.* at 45, 91 S.Ct. at 1286. At issue in *Swann* was a state statute that provided:

No student shall be assigned or compelled to attend any school on account of race, creed, color or national origin, or for the purpose of creating a balance or ratio of race, religion or national origins. Involuntary bussing of students in contravention of this article is prohibited, and public funds shall not be used for any such bussing.

Observing that "state policy must give way when it operates to hinder vindication of federal constitutional guarantees," *id.* at 45, 91 S.Ct. at 1286, the *Swann* Court concluded:

. . . the flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. As we have held . . . the Constitution does not compel any particular degree of racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against use of such a device—even as a starting point—contravenes the implicit command of *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) that all reasonable methods be available to formulate an effective remedy.

*Id.* at 46, 91 S.Ct. at 1286.

*Swann* is not this case, however. Unlike in *Swann,* the statutory provisions being questioned in the instant case do not *bar* local school officials, whose primary duty it is to maintain unitary educational systems, from exercising their discretion to employ transportation solutions when found to be necessary to insure equality of treatment. Far from mandating the exercise of discretion by state officers against transportation remedies, the Esch and Eagleton-Biden Amendments preserve the idea that local authorities are the parties best suited in the first instance to determine whether busing is needed to comply with equal protection.

Nor do these amendments bar federal authorities from exercising discretion to require student transportation when found to be a necessary device to effectuate federal guarantees. Nothing in either the Esch or the Eagleton-Biden Amendment prevents students aggrieved by discrimination from seeking redress in the federal courts. Neither are the federal courts themselves stripped of their authority or, as was the practical effect of the statute involved in *Swann,* their ability, to require transportation remedies when indicated. Nor do the two provisions at issue completely check the authority of federal executive officers from proceeding to effect busing solutions in cases where federal rights are violated. It is true that Esch and Eagleton-Biden preclude one alternative method, the fund termination procedure, by which one federal agency, HEW, may pursue the goal of equality in federally-supported education. And it may also be true that enforcement of the law by the fund termination procedure is the more effective, since certainly it is the more coercive way to bring offending school districts into compliance with the equality mandate. But the fact remains that the Esch and Eagleton-Biden Amendments leave untouched the litigation enforcement option that permits the Civil Rights Division of the Department of Justice, upon referral of a case from HEW, to pursue legal action and obtain the full measure of appropriate relief, including student transportation if warranted, against the offending recipients. In short, contrary to the situation presented in *Swann,* the statutes involved in the case at bar, do not qualify as "flat" or "absolute prohibitions" against the use of needed transportation remedies. While they remove one setting out of which busing orders may originate, they quite clearly preserve student transportation as an available method of insuring equality in education.

The availability of the litigation option also undercuts plaintiffs' alternative constitutional challenge. As a second line of attack, plaintiffs contend that the necessary effect of the Esch and Eagleton-Biden provisions is to bring the federal government into the posture of having to furnish financial aid to school districts that operate impermissible dual school systems. Plaintiffs' principal focus is on a line of cases beginning with *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) and including this Circuit's decision in *Kelsey v. Weinberger,* 162 U.S.App.D.C. 159, 167–168, 498 F.2d 701, 709–10 (1974) that establish the rule that no government funds should be dispensed to support illegal discrimination. Relying on this rule, plaintiffs reason that, since busing remedies are sometimes indispensable to the achievement of equal educational opportunities, and since the two disputed amendments prevent HEW from terminating financial support in cases where busing is thought to be the only feasible means of insuring equal treatment, the inevitable result of Esch and Eagleton-Biden will be to place "the Federal Government in an involvement with racially segregated education which the Fourteenth [Amendment] prohibits to the states." *Kelsey, supra,* 162 U.S.App.D.C. at 168, 498 F.2d at 710.

This reading of the two amendments is exaggerated and unpersuasive. Plaintiffs' argument would have force if fund termination were the exclusive means by which the federal government could make sure that only lawfully administered school systems receive federal financial aid. But, as stated, fund termination is only one course of action available to the federal government to insure equality in federally-sponsored education. Notwithstanding Esch and Eagleton-Biden, the referral and litigation option remains an available enforcement technique that carries as much promise from the standpoint of assuring aid only to proper recipients as the fund cut-off procedure.

Obviously, the litigation alternative operates in the opposite direction from the termination technique. Litigation is aimed at bringing offending recipients into compliance with federal law, while the administrative procedure directly results in severing financial ties with school systems that are willing to accept the loss of federal support as the price for operating their schools, over HEW's objections, as they see fit. But there is nothing in the *Cooper* and *Kelsey* line of decisions that requires the government to end its support of unequal education by proceeding in one way rather than the other. The concern of these cases is that federal support be furnished only to institutions that comply with the mandates of federal law. If this objective can be carried out effectively though indirectly through litigation, instead of directly through fund termination, the government's obligation under *Cooper* and *Kelsey* is nevertheless discharged.

Nor can the lawsuit option be faulted on the grounds that fund termination is likely to sever improper financial ties more promptly than litigation. As applicable regulations make clear, *see* 45 C.F.R. §§ 80.8–.11 (1977), and as prior proceedings in this case confirm, *see Brown v. Weinberger,* 417 F.Supp. 1215 (D.D.C.1975), the fund termination procedure involves a tedious series of notice, hearing and review steps at the various levels within HEW's hierarchy followed by separate review in the courts. By contrast, the litigation technique bypasses the most cumbersome of the administrative steps and allows the Justice Department to initiate appropriate legal action promptly upon the referral of cases from HEW. This streamlined enforcement approach promises as great if not greater promptness in limiting aid to deserving recipients than does the alternate fund termination process. *See* 28 C.F.R. § 50.3, Alt. 1–B–1 (1977) ("Compliance with the nondiscrimination mandate of Title VI may often be obtained more promptly by appropriate court action than by hearings and termination of assistance").

From the foregoing, it is evident that enactment of the Esch and Eagleton-Biden Amendments is unlikely to bring about the results plaintiffs read into them. Admittedly, they work a significant adjustment in the ways the executive branch of the federal government may go about insuring equal

educational opportunities in federally-sponsored institutions. But neither provision operates by its express terms to foreclose the availability of remedies that may be necessary to guarantee federal rights in given instances. Consequently, mindful of the presumption of constitutionality to be given to federal statutes, the Court is of the opinion that the enactments at issue in this case must survive plaintiffs' constitutional attack.

This conclusion, however, embodies only a view concerning the *facial* constitutionality of the two disputed provisions. Whether the Esch and Eagleton-Biden Amendments, as interpreted and administered by responsible officers at HEW and the Department of Justice, will have the practical effect of taking the core out of the government's overall Title VI enforcement program is not an issue now before the Court. Should further proceedings in this case reveal that the litigation option left undisturbed by these provisions cannot, *or will not,* be made into a workable instrument for effecting equal educational opportunities, the Court will entertain a renewed challenge by plaintiffs on an *as applied* basis. For the present, however, plaintiffs' motion for declaratory and injunctive relief must be denied.

An appropriate order will be issued of even date herewith.