LeRoy ZASLAWSKY et al.,
Plaintiffs-Appellants,

v.

BOARD OF EDUCATION OF the LOS ANGELES CITY UNIFIED SCHOOL DISTRICT et al., Defendants-Appellees.

No. 77–3401.

United States Court of Appeals,
Ninth Circuit.

Dec. 28, 1979.

George E. Dalton, Los Angeles, Cal., for plaintiffs-appellants.

Steven J. Carnevale, Los Angeles, Cal., Jeremiah Glassman, Washington, D.C., for defendants-appellees.

Before CHOY, ANDERSON and HUG, Circuit Judges.

HUG, Circuit Judge:

The appellants, approximately 25,000 teachers employed by the Los Angeles Unified School District (LAUSD), brought this class action suit in the district court, alleging that the LAUSD violated their Fourteenth Amendment equal protection rights and other rights protected by federal law when it implemented, at the insistance of HEW and in the absence of a finding of *de jure* segregation, a faculty integration plan. The plan required that the makeup of racial and ethnic minority and non-minority teachers in the district as a whole be substantially reflected in the faculty composition at each school in the district. The plan provided for the involuntary reassignment of teachers as a means to achieve those goals. The district court held that the plan did not violate the appellants' federal constitutional or statutory rights. We affirm.

## FACTS

The LAUSD's teaching force is made up of approximately thirty percent racial and ethnic minorities and seventy percent non-minorities. Prior to September of 1975, there was a substantial faculty racial imbalance in a vast majority of the LAUSD's approximately 570 schools. At that time

over seventy percent of the district's schools had single-race faculties. Further, in most instances where there was a disproportionate number of minority teachers at a particular school, there was also a disproportionate number of minority students.[1]

In an attempt to have each school's faculty composition reflect that of the district as a whole, the LAUSD Board of Education, in January of 1975, adopted a "Staff Integration Program" (not the plan at issue here). That plan met with little success.

In April of 1975, Region IX of the Office of Civil Rights (OCR) of HEW notified the LAUSD that the "Staff Integration Program" did not comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Particular objection was made to the plan's schedule of implementation and the degree of integration that it intended to establish. The OCR further advised that the existing racial composition of both students and faculties raised a presumption that the district had been assigning teachers in a discriminatory manner.

In March of 1976, OCR again reminded the LAUSD of its continuing failure to comply with Title VI and gave it thirty days to submit an acceptable plan. The OCR indicated that the revised plan would have to include standby mandatory transfer provisions. The OCR further advised that it would commence administrative enforcement proceedings to cut off federal financial assistance to the district in the event of noncompliance.

Thereafter, LAUSD officials, in cooperation with OCR and teacher representatives, devised a "Staff Integration Plan—Revised" (the plan in question), which was adopted by a 4–3 vote of the LAUSD Board on May 3, 1976. The revised plan's ultimate goal was to have each school's faculty makeup reflect, within a range of plus or minus ten percent, the district-wide composition of thirty percent racial and ethnic minorities and seventy percent non-minorities. In accordance with OCR's request, the plan provided that in the event integration goals could not be met by voluntary transfers, mandatory transfers would have to be utilized to bring the faculty of each school into balance.

The LAUSD Board's decision to adopt the revised plan was based on a number of considerations. Specifically, the board reasoned that adoption of the plan would (1) provide students with a multicultural learning experience; (2) comply with the mandates of the California Constitution; (3) settle a lawsuit against it pertaining to segregated faculties; (4) result in voluntary compliance with Title VI; and (5) make the district eligible for Emergency School Aid Act funding.

The revised plan met with substantial success. However, in order to meet the integration goals, several hundred teachers were mandatorily transferred by means of a random selection process.[2]

---

1. *See Kelsey v. Weinberger*, 162 U.S.App.D.C. 159, 498 F.2d 701, 704–05 (D.C. Cir. 1974). There the District of Columbia Circuit noted the LAUSD's racially imbalanced school faculties.

2. The district court's memorandum opinion described the operation of the Plan:

Under the Plan, new teachers, those returning from leaves of absence and voluntary transferees are first utilized in an effort to achieve the proposed faculty integration levels. The District instituted incentives for voluntary transferees including: guaranteed return to their home school after two years of service; choice of location to which to be transferred; priority transfer ahead of those who wished to transfer for non-Plan related reasons; priority rating for summer school positions; improved probationary contract opportunities for partici-

pating substitute teachers; improved binding employment agreement opportunities for long-term substitutes; and special recognition from the Superintendent.

If nonmandatory efforts fail to produce the projected levels of integration, mandatory transfers are to be utilized to bring the faculty of each school into balance. Mandatory transferees are chosen by random selection according to the last four digits of the social security numbers of eligible candidates. Individual teachers are exempted from mandatory reassignment if they are over 60 years of age; have less than three years of service at their present school; or can establish special medical or hardship problems before a panel constituted to resolve such claims. In order to reduce disruption of education programs, each school's principal can exempt up to twenty-five

## DISCUSSION

The appellants argue that because the revised plan takes race into account in the mandatory reassignment of teachers, it violates their equal protection rights under the Fourteenth Amendment and also 42 U.S.C. § 1981.[3] We do not agree.

The Supreme Court has acknowledged that race considerations may be taken into account in the assignment of teachers. *E.g., United States v. Montgomery County Board of Education*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). In *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 19, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971), the Court stated:

[T]he . . . school board has argued that the Constitution requires that teachers be assigned on a "color blind" basis. It also argues that the Constitution prohibits district courts from using their equity power to order assignment of teachers to achieve a particular degree of faculty desegregation. We reject that contention.

The relevance of the integration of faculty assignments in elimination of segregated school systems was recently reaffirmed in *Columbus Board of Education v. Penick*, —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Board of Education v. Brinkman*, —— U.S. ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). It is clear that faculty assignment plays an important part in the overall plans to eliminate dual or segregated school systems. In *Columbus Board of Education*, —— U.S. —— —— ——, 99 S.Ct. 2951, 61 L.Ed.2d 682–83, the Court quoted with approval the circuit court opinion:

"The practice of assigning black teachers and administrators only or in large majority to black schools likewise represented a systemwide policy of segregation. This policy served until July, 1974 to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools." 583 F.2d, 787 at 814 (6th Cir.).

Other circuits have required integration plans to have the ratio of racial and ethnic minorities and non-minorities in faculties at each school in a district be approximately the same as the district-wide ratio. *See Singleton v. Jackson Municipal Separate School Dist.*, 419 F.2d 1211, 1217–1218 (5th Cir. 1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970); *Nesbit v. Statesville City Board of Education*, 418 F.2d 1040, 1042 (4th Cir. 1969).

The appellants argue that a race-conscious plan is permissible only when there has been a judicial finding of *de jure* segregation. We note, however, that the Supreme Court has approved of various kinds of race-conscious plans in the absence of

---

percent of the teachers at that school from mandatory transfer for one year.

Teachers selected to be transferred are assigned to schools where their individual race or ethnicity will help achieve the goals of the Plan. No teacher is transferred from a school where his or her race/ethnicity contributes to achieving the Plan's level of integration for that school.

The Plan was implemented in September, 1976 and resulted in substantial success in meeting the first phase goals. By October, 1976, the 1976-1977 program objective had been reached in 562 of 567 District schools. Voluntary transferees totaled 544 teachers, of which 450 were minorities. In order to meet the Plan's objectives, an additional 405 teachers were mandatorily transferred under the random selection process.

As a result of the District's submission of the Plan to OCR, and its subsequent implementation, OCR concluded that the District was in substantial compliance with Title VI of the Civil Rights Act of 1964 with regard to faculty assignments, and therefore administrative enforcement proceedings were not commenced.

**3.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

such findings. *See United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (voluntary compliance with the Voting Rights Act); *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971) (voluntary school desegregation). Further, the Court has noted that an integration plan which involves prescribed ratios can be voluntarily adopted by a school board. In *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. at 16, 91 S.Ct. at 1276, the Court stated:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities . . . .

This reasoning was again emphasized in *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). There the Court stated:

> We observed in *Swann, supra*, [402 U.S.] at 16, [91 S.Ct. 1267, at 1276], that school authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements.

School authorities should have just as much discretion in formulating faculty integration plans to carry out an educational policy to achieve better racial balance.

■ The appellants finally argue that the LAUSD's adoption of the revised plan was not voluntary because HEW threatened to cut off federal funding in the event of noncompliance. Under Title VI, Congress declared that racial discrimination in federally-assisted funding was impermissible. It further directed federal agencies which extend funds to issue regulations and to enforce them by terminating funds to violators. Here the LAUSD was found to be in violation of Title VI. The LAUSD could have challenged HEW's determination by requesting a hearing pursuant to 45 C.F.R. §§ 80.8(c), 80.9 (1978), or sought injunctive relief to prevent HEW from acting. *See Mandel v. U.S. Dept. of Health, Educ. & Welfare*, 411 F.Supp. 542 (D.Md. 1976), aff'd, 571 F.2d 1273 (4th Cir. 1978), cert. denied, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978). The LAUSD, however, through its governing board of education, declined to pursue either course by voting to adopt the plan recommended by HEW.

The school district is not precluded from taking voluntary action to obtain better racial balance in its teaching faculty. We agree with the statement of four Justices in the Supreme Court's *Bakke* decision:

> It would be inconsistent with . . . the emphasis of Title VI and the HEW regulations on voluntary action . . . to require that an institution wait to be adjudicated to be in violation of the law before being permitted to voluntarily undertake corrective action . . . .

*University of California Regents v. Bakke*, 438 U.S. 265, 352, 98 S.Ct. 2733, 2780, 57 L.Ed.2d 750 (1978) (Opinion of Brennan, White, Marshall and Blackmun, JJ., separate opinion).

The action of the school board was not directed toward the employment opportunities available to teaching faculty nor the elimination of any past discrimination in employment. We do not approach the issue in that frame of reference. The focus of this action of the school board was to enhance the educational opportunities available to the students by achieving better racial balance in the teaching faculty throughout the district. This is an educational objective which has been well recognized and approved by the Supreme Court. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. at 16, 19, 91 S.Ct. 1267 (1971).

Affirmed.