**Darryl W. BROWN and David Brown, Infants, by their parent, Jo Ann Brown, et al., Appellants,**

v.

**Joseph A. CALIFANO, Individually and as Secretary of Health, Education and Welfare, et al.**

**No. 78–1864.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1979.

Decided Jan. 31, 1980.

Joseph L. Rauh, Jr., Washington, D. C., with whom John Silard, Elliott C. Lichtman, William L. Taylor, Washington, D. C., James M. Nabrit, III, Bill Lann Lee and Eric Schnapper, New York City, were on the brief, for appellants.

Frank A. Rosenfeld, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and GESELL,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Darryl and David Brown and sixteen other public school children, the appellants, challenge the constitutionality of amendments that restricts federal methods for assuring nondiscrimination in public schools receiving federal support.[1] The amendments essentially prevent the Department of Health, Education, and Welfare (HEW)[2] from requiring "the transportation of any student to a school other than the school which is nearest the student's home."[3] The district court found that the existence of an alternative federal avenue to effect transportation remedies saves these amendments from constitutional challenge on their face.[4] The district court explicitly left open the possibility of future challenges to the amendments as applied.[5] For the reasons described below, we affirm.

## I. BACKGROUND

Full understanding of this case requires a brief historical review of civil rights en-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Initiated in 1975, this suit is a companion case to *Adams v. Richardson*, 351 F.Supp. 636 (D.D.C. 1972), *modified*, 356 F.Supp. 92 (D.D. C.), *aff'd*, 156 U.S.App.D.C. 267, 480 F.2d 1159 (D.C. Cir. 1973) (en banc). Both suits challenged the Department of Health, Education, and Welfare's (HEW's) failure to enforce Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (1976) and the fifth and fourteenth amendments of the Constitution. In both cases, plaintiffs prevailed in the charge that HEW had defaulted in its duty to enforce Title VI. In 1973, Judge Pratt in *Adams, supra*, ordered HEW to take enforcement measures in the Southern school districts involved in that suit. In 1976, Judge Sirica ordered HEW to enforce Title VI in 46 specified Northern and Western school districts. *Brown v. Califano*, No. 75-1068, Memorandum and Order, July 20, 1976. The judge ordered HEW to conclude pending investigations and to commence enforcement proceedings against specified non-complying school districts. *Id.*

   In 1977, the certified class of plaintiffs in this suit moved for further declaratory and injunctive relief. They challenged the constitutionality of amendments passed during the pendency of the suit which restrict HEW's enforcement ability. Judge Sirica's judgment denying such relief is the only matter here on appeal. *See Brown v. Califano*, Memorandum Opinion, No. 75-1068 (D.D.C. filed July 18, 1978), Joint Appendix (J.A.) at 1. *See also* Stipulation and Order, No. 75-1068, Jan. 10, 1978 (consent or-

der entered Dec. 29, 1977 settles all outstanding claims "except for plaintiff's pending motion for injunctive and declaratory relief regarding the Esch Amendment, the Byrd Amendment, and the Eagleton-Biden Amendment").

2. As in all proceedings in this case, references to HEW refer also to its successors, agents, and employees.

3. Eagleton-Biden Amendment, § 208(b), P.L. 94-206, codified at 42 U.S.C. § 2000d (1976). This language replaced the Byrd amendment, also challenged here, and it provides a stricter limitation on transportation than the earlier Esch amendment, which is also challenged. *See* § 209, 90 Stat. 22 (1975) (Byrd amendment); 20 U.S.C. § 1714(c) (1976) (Esch Amendment). The Esch Amendment itself was modified by the Scott-Mansfield Amendment. Thus, four provisions are at issue here. *See generally* discussion *infra* at nn. 26-27.

4. *Brown v. Califano*, Memorandum Opinion, No. 75-1068 (D.D.C. filed July 18, 1976), J.A. at 1, 8-9 [hereinafter cited to J.A. as Memorandum Opinion].

5. Should further proceedings in this case reveal that the litigation option left undisputed by these provisions cannot, *or will not*, be made into a workable instrument for effecting equal educational opportunities, the Court will entertain a renewed challenge by plaintiffs on an *as applied* basis. *Id.* at 12-13.

forcement and of HEW's administrative scheme under Title VI before and after the challenged amendments were enacted.

## A. Civil Rights Enforcement

The guarantees of the Fourteenth Amendment proved elusive for nearly a century. Two effective litigative strategies finally bore fruit in the 1950's. First, *Brown v. Board of Education*,[6] held that the Constitution demands the dismantling of dual school systems, intentionally segregated by race. Second, *Cooper v. Aaron*[7] and related cases barred governmental support of unconstitutionally discriminatory institutions.

Both concepts were incorporated in the first sweeping federal commitment to civil rights enforcement, the Civil Rights Act of 1957 (the Act).[8] Title VI of the Act prohibits discrimination on the ground of race, color, or national origin under any program receiving federal financial assistance.[9] Each federal department can ensure compliance by 1) refusing financial assistance to any recipient found violating the prohibition after a finding on the record, with an opportunity for a hearing; or 2) "by any other means authorized by law."[10] The Act specifically provides that enforcement efforts should not begin until the noncomply-

ing party has been notified and given an opportunity to comply voluntarily.[11] Thus the Act permits the Executive to avoid providing support to noncomplying public school districts, and to use the threat of fund-termination to persuade or induce recipients to dismantle vestiges of segregation.

## B. HEW Enforcement Before the Amendments

Through agreement with other executive departments, HEW assumed responsibility for Title VI enforcement with respect to most federal financial assistance to elementary, secondary and higher education and other specified health and social welfare activities.[12] Between the passage of the Act and March of 1970, HEW diligently followed rules[13] it promulgated under Title VI and brought some six hundred administrative proceedings against noncomplying districts.[14] Then, between March 1970 and February 1971, HEW brought no enforcement proceedings. At the same time, HEW continued to advance federal funds to schools HEW found in violation of Title VI.[15]

Based on factual findings of this sort, Judge Pratt in *Adams v. Richardson*[16] and

---

**6.** 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 108 (1955) (*Brown II*).

**7.** 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). *See* discussion *infra* at p. —— of 201 U.S.App. D.C., at p. 1235 of 627 F.2d.

**8.** 42 U.S.C. §§ 1971, 1975a–1975d, *et seq.* (1976).

**9.** Title VI of the Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d (1976) [hereinafter cited as Title VI].

**10.** Title VI, § 602, 42 U.S.C. § 2000d–1 (1976). HEW regulations specify referral to the Department of Justice as the primary other means under law. 45 C.F.R. § 80.8(a) (1979); *see* p. —— of —— U.S.App.D.C., p. 1225 of 627 F.2d *infra*.

**11.** *Id.*

**12.** In Executive Order No. 11247, President Lyndon Johnson directed the Attorney General to coordinate enforcement of Title VI and di-

rected each department to cooperate in the enforcement. 30 Fed.Reg. 12327 (1965), *reprinted in* 42 U.S.C. § 2000d–1 (1976). HEW is responsible for assuring nondiscrimination in the use of funds from 186 federal financial assistance programs. 45 C.F.R. § 80.13 (1979) (Appendix A).

**13.** *See* 45 C.F.R. Part 80 (1979).

**14.** *Adams v. Richardson*, 351 F.Supp. 636, 640 (D.D.C.1972).

**15.** 351 F.Supp. at 640; 356 F.Supp. 92, 94 (D.D. C.1973) (Judge Pratt's findings of fact in *Adams v. Richardson*).

**16.** 356 F.Supp. 92, 95 (D.D.C.1973) ("Having once determined that a school district is in violation of Title VI, and having failed during a substantial period of time to achieve voluntary compliance defendants have a duty to commence enforcement proceedings.").

Judge Sirica in the earlier proceedings in this case [17] ordered declaratory and injunctive relief requiring HEW to resume enforcement under Title VI. Those decisions disapproved of HEW's conduct but left its regulations in place to guide future enforcement.[18] Under these regulations, HEW requires elementary and secondary school applicants and recipients to provide assurances of their compliance with desegregation plans.[19] HEW can investigate actual compliance on its own initiative; it must investigate private complaints about noncompliance.[20] Upon finding apparent violation of the assured compliance, HEW must notify the recipient and seek voluntary compliance.[21] If voluntary compliance cannot be secured, HEW can pursue enforcement through fund termination proceedings within the agency,[22] or through other means under law.[23] The regulations specify the primary alternative to fund-termination: referral to the Department of Justice with a recommendation of appropriate legal action.[24] Reflecting the regulations' emphasis on voluntary compliance, HEW informally resolved findings of noncompliance in nearly all cases between 1972 and 1978: funds were actually terminated in only one instance.[25]

**17.** *Brown v. Califano*, Memorandum and Order, No. 75–1068 (D.D.C., filed July 20, 1976). *See* note 1 *supra.*

**18.** *E. g., Adams v. Richardson*, 156 U.S.App. D.C. 267, 271 n. 5, 480 F.2d 1159, 1163 n. 5 (D.C. Cir. 1973); *Brown v. Califano*, Memorandum and Order, No. 75–1068 (D.D.C. filed July 20, 1976), 13–14.

**19.** 45 C.F.R. § 80.4(c) (1979) (elementary and secondary school applicants must provide sufficient assurance that they will comply with a desegregation plan approved by the appropriate HEW official or with a final federal court desegregation order). *See also* 45 C.F.R. § 80.-4(a) (1979) (each applicant for federal funds must submit assurance that its program will not discriminate as prohibited).

**20.** 45 C.F.R. §§ 80.7(a), (b), (c) (1979). *See also* 45 C.F.R. § 80.6(a), (b) (1978) (HEW can request compliance reports; recipients shall provide information requested by HEW).

**21.** 45 C.F.R. § 280.7(d) (1979).

**22.** 45 C.F.R. § 80.8(a), (c) (1979). The regulations impose procedural requirements for fund termination:

No order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured through voluntary means, (2) there has been an express finding on the record, after an opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part, (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.

45 C.F.R. § 80.8(c) (1979). Termination hearings must follow the procedures outlined in 45 C.F.R. §§ 80.9, 81.71, *et seq.* (1979). A termination decision is appealable within the agency, 45 C.F.R. § 80.10(e), (g) (1979), and finally, to court, 45 C.F.R. § 80.11 (1979).

**23.** 45 C.F.R. § 80.8(a), (d) (1979).

**24.** 45 C.F.R. § 80.8(a) (1979). The Department of Justice may bring litigation to enforce any rights of the United States or the contractual assurance to HEW. *Id. See also* 28 C.F.R. §§ 0.50, 50.3 (Alt. I–B–1) (1979) (Department of Justice Regulations directing initiation or intervention in civil suits to achieve compliance).

Referral to the Department of Justice can be used only after HEW (1) determines that voluntary compliance cannot be secured, (2) notifies the recipient of failure to comply and of the action intended, and (3) provides 10 days after mailing notice to the recipient, during which time HEW is to make additional effort to persuade the recipient to take corrective action. 45 C.F.R. § 80.8(d) (1979).

**25.** Deposition of David Tatel, March 17, 1978 at 93, J.A. at 51. The one district for which funds were terminated was *Ferndale, Michigan School Dist. of Ferndale v. HEW*, 474 F.2d 1349 (6th Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 126, 38 L.Ed.2d 57 (1973), *rehearing denied*, 414 U.S. 1172, 94 S.Ct. 934, 39 L.Ed.2d 121 (1974). The record in this case does not disclose fuller data on the numbers of cases or kinds of plans accepted.

## C. The Effect of the Amendments on the Enforcement Scheme

Enacted as floor amendments to appropriation bills, the amendments challenged here lack careful explanation or description of their intended effect on HEW's enforcement procedures under Title VI. (A lengthy footnote discusses the congressional debates over the amendments.)[26] Their

26. Appellants challenge three amendments that successively restrict the ability of HEW to require transportation to remedy segregation:

1) *The Esch Amendment*: Rejected by the House Committee, this amendment was introduced and passed during House floor debate on H.R. 69, The Elementary and Secondary Education Act Amendments of 1974. See H.R.Rep. No.93-805, 93rd Cong., 2d Sess. 245 (1974), U.S.Code Cong. & Admin.News 1974, p. 4093 (Additional view of Mr. Esch on H.R. 69); 120 Cong.Rec. 8262 (1974) (Rep. Esch introducing amendment); 120 Cong.Rec. 8281 (1974) (Esch Amendment passes House). The amendment, called the Equal Educational Opportunities Act of 1974, defines unlawful denial of equal educational opportunity, provides that racial imbalance alone does not constitute such a denial, describes civil enforcement options, and lists remedies in priority of congressional preference. The portion challenged in this suit provides that:

No court, department, or agency of the United States shall, pursuant to section 1713 of this title [listing priority of remedies for denial of equal educational opportunity] order the implementation of a plan that would require the transportation of any student to a school other than the school closest or next closest to his place of residence which provides the appropriate grade level and type of education for such student.

Section 215(a), P.L. 93-380, *codified at* 20 U.S.C. § 1714(a) (1976).

The Senate and the Conference Committee modified the effect of the Esch Amendment by also adopting the Senate Scott-Mansfield Amendment, which says in pertinent part:

the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States.

Section 203(b), P.L. 93-380, *codified at* 20 U.S.C. § 1702(b) (1976).

Though some argued that the Scott-Mansfield provision negated the effect of the Esch Amendment, *e. g.*, 120 Cong.Rec. 14859 (1974) (remarks of Rep. Pucinski), the two amendments have been construed together to mean that no court is constrained from providing whatever remedy it deems necessary, but federal departments such as HEW cannot require student transportation beyond the school next closest to his place of residence and offering the appropriate program. *E. g.*, 120 Cong.Rec. 15078 (1974) (remarks of Sen. Scott).

2) *The Byrd Amendment*: A rider to the fiscal 1976 Labor-HEW Appropriations Act, this amendment was added in the Senate after the bill was approved by both the House and the Senate Appropriations Committee. It was intended to perfect the Biden Amendment that already had passed but that was criticized for in effect repealing Title VI. The Biden Amendment prohibited the use of appropriated funds to require assignment of teachers or students "for the reason of race." 121 Cong.Rec. 29688 (1975).

The Byrd Amendment's proscription is narrower:

None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home and which offers the course of study pursued by such student, in order to comply with title VI of the Civil Rights Act of 1964.

Section 209, P.L. 94-206, *codified at* 42 U.S.C. § 2000d (1976).

Debate on the Byrd Amendment was far more limited than debate on the Biden Amendment, and on the Helms Amendment, which was tabled. Nonetheless, it is clear that the author of the Byrd Amendment intended it to

provide that the funds appropriated in this act cannot be utilized by HEW either directly or indirectly to require the transportation of any student to any school beyond his neighborhood school—beyond the school nearest his home—except in instances wherein the student could not pursue the courses of study he desires to pursue at the nearest school.

\* \* \* \* \* \*

This amendment will reach the bureaucrats in HEW and provide that they cannot use taxpayer's money to require, directly or indirectly, the transportation of students beyond their neighborhood schools to bring about an arbitrary racial balance.

121 Cong.Rec. 30038 (1975) (remarks of Sen. Byrd).

The amendment was enacted when the appropriations act was passed over presidential veto unrelated to the busing provision. It was reenacted with the appropriations bill for fiscal 1977. See § 208, P.L. 94-439, *codified at* 42 U.S.C. § 2000d (1976). *See generally* 121 Cong. Rec. 29696 (1975) (remarks of Rep. Allen); 122 Cong.Rec. 21196 (1976) (remarks of Sen. Brooke).

3) *The Eagleton-Biden Amendment*: After the reenactment of the Byrd Amendment for fiscal 1977, the Attorney General and the Secretary of HEW construed it to permit HEW to reject remedial plans not pairing or clustering schools. Pairing treats two schools as one

general purpose, however, is clear. Congress wanted to ensure that no student would be transported beyond the school nearest his home[27] because of an HEW requirement.[28]

Of course, as members of Congress were aware, HEW never had the authority to order any particular remedial plan.[29] Its enforcement authority permits it only to require assurances of compliance from applicants, and to seek enforcement through fund-termination proceedings or referral to the Department of Justice.[30] Nonetheless, as the legislative debates also acknowledge, the power to threaten fund-termination—the power that attaches strings to financial assistance—can often work coercively.[31] Thus, Congress explicitly intended that HEW could not use this power to require, "directly or indirectly,"[32] student transportation beyond the school closest to their home. Nor may it pressure a district to restructure grade levels offered at particular schools, thereby changing the location of the nearest school "which provides the ap-

unit, with some of the grade levels housed in one, and the rest housed in the other. Similar grade or program restructuring takes place among more schools through clustering. A remedial plan using these strategies could effectively change the location of the "nearest" school "which offers the courses of study pursued by such student." Byrd Amendment, *supra*. As a result, busing could be required to take students beyond schools physically nearest their homes.

In his legal memo on the subject, the Assistant Attorney General for the Civil Rights Division explained that this interpretation was not inconsistent with the amendment's legislative history, and avoided possible conflict with Title VI and the Constitution. A stricter interpretation, he explained could preclude all HEW action to desegregate schools. Memorandum for the Attorney General Re: HEW Interpretation of Byrd Amendment, *reprinted in* 123 Cong. Rec. S10908 (daily ed. June 28, 1977).

Supporters of the Eagleton-Biden Amendment claimed that the HEW-Justice interpretation "circumvents the clear intent" of the Byrd Amendment by permitting HEW to require busing. 123 Cong.Rec. S10897 (daily ed. June 28, 1977) (remarks of Sen. Eagleton); *see* 123 Cong.Rec. H6045 (daily ed. June 16, 1977) (remarks of Rep. Mottl); 123 Cong.Rec. S10916 (daily ed. June 28, 1977) (remarks of Sen. Biden). The new amendment was designed to "close this loophole" created by the HEW-Justice interpretation. 123 Cong.Rec. H6046 (June 16, 1977) (remarks of Rep. Milford).

The amendment, as enacted, replaces the Byrd Amendment with the following language: None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, to the school offering such special education, in order to comply with title VI of the Civil Rights Act of 1964. For the purpose of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the

grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructing, pairing, or clustering. The prohibition described in this section does not include the establishment of magnet schools.
42 U.S.C. § 2000d (1976).

27. The Byrd and Eagleton-Biden Amendments effectively supercede the more generous Esch Amendment. *Compare* 20 U.S.C. § 1714(c) (1976) (Esch Amendment) (permits transportation to "closest or next closest school") *with* 42 U.S.C. § 2000d (1976) (Byrd and Eagleton-Biden Amendments) (no transportation other than to "the school which is nearest the student's home"). The Eagleton-Biden Amendment does permit further transportation, however, for special education and to magnet schools. 42 U.S.C. § 2000d (1976). Representative Stokes noted that determining what actually is the "nearest" school itself is a problematic task for HEW. 122 Cong.Rec. 20408 (1976).

28. A purpose frequently reiterated by the amendments' sponsors is that "a busing order should certainly come from a court rather than an administrative agency." 122 Cong.Rec. 21198 (1976) (Sen. Biden describing Byrd Amendment passed in previous term).

29. *E. g.*, 121 Cong.Rec. 30542 (1975) (remarks of Sen. Humphrey).

30. *See* pp. ——–—— of 201 U.S.App.D.C., pp. 1224–1225 of 627 F.2d and notes 19–24 *supra*.

31. *E. g.*, 123 Cong.Rec. H6045 (daily ed. June 16, 1977) (remarks of Rep. Mottl) (fund-termination power gives HEW blackmail power); 121 Cong.Rec. 30358, 30361 (1975) (remarks of Sen. Biden); 120 Cong.Rec. 8523 (1974) (remarks of Rep. Ashbrook).

32. 42 U.S.C. § 2000d (1976). Senator Biden said the word "indirectly" was meant to cover HEW's fund-termination power. 121 Cong. Rec. 30361 (1975) (remarks of Sen. Biden).

propriate grade level"[33] or "course of study pursued" by each student.[34]

Although the sponsors maintained that HEW retains Title VI enforcement authority under the amendments,[35] the extent of that authority is not entirely apparent.[36] On the one hand, it is clear that the amendments leave intact HEW's entire administrative enforcement process, including fund-termination, for violations not calling for transportation remedies.[37] But the legislative debates do not identify when and through what procedures HEW can avoid funding schools known to violate the Constitution and Title VI.[38] Congress apparently intended HEW to retain the power to refer cases to the Department of Justice for appropriate legal action.[39] Congress neglected, however, to specify the steps HEW may take before a referral. Thus, although it expressly wished HEW to continue its role in seeking *voluntary compliance*,[40] Congress did not explain the extent of that role when transportation remedies are at issue.[41] The effect of the amendments is especially ambiguous insofar as they modify the order

**33.** 20 U.S.C. § 1714(c) (1976).

**34.** 42 U.S.C. § 2000d (1976).

**35.** 123 Cong.Rec. S10901, S10905 (daily ed. June 28, 1977) (remarks of Sen. Eagleton); 121 Cong.Rec. 30358 (1975) (remarks of Sen. Biden).

**36.** Senator Humphrey, for example, said the ambiguity created by the Byrd Amendment would pose a difficult interpretation problem for the courts. 121 Cong.Rec. 30542 (1975). *See also* 124 Cong.Rec. H7535 (daily ed. June 16, 1977) (remarks of Rep. Flood). Representative Obey argued that the confusion surrounding the Eagleton-Biden Amendment was the best argument against its passage. 123 Cong. Rec. H6050 (daily ed. June 16, 1977).

This legislative ambiguity is especially pronounced because there are no committee or conference reports describing the intended operation of the amendments. *See* 121 Cong.Rec. 39030 (1975) (remarks of Sen. Magnusen) (Byrd Amendment should be separate legislation, dealt with by legislative committee, rather than rider to appropriations bill). As a result, the court is put in the position of having to actively seek the amendments' meaning—running the risk of criticism for an activist posture. *Cf. Rosado v. Wyman*, 397 U.S. 397, 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970) (court strains to determine meaning of legislative compromise with "those commonsense assumptions that must be made in determining direction without a compass"); H.L.A. Hart, The Concept of Law 140 (1961) (courts invite criticism for frequently acting upon unsettled meaning of a law).

**37.** 121 Cong.Rec. 29811 (1975) (remarks of Sen. Eagleton on Byrd Amendment). *See also* 121 Cong.Rec. 30358 (1975) (remarks of Sen. Biden on defect in Biden Amendment).

**38.** An apparently major thrust of the amendments is to prevent HEW from relying on only its own administrative judgment to determine the need for a busing remedy. 123 Cong.Rec. S10898, S10901 (daily ed. June 28, 1977) (remarks of Sen. Eagleton). But the legislative history is replete with comments acknowledging the constitutional problem posed if HEW is forced to fund school districts that violate the Constitution. *E. g.*, 123 Cong.Rec. H6051 (daily ed. June 16, 1977) (remarks of Sen. Edwards and Sen. Blanchard); 121 Cong.Rec. 30543 (1975) (remarks of Sen. Humphrey). *See also* 120 Cong.Rec. 14912 (1974) (remarks of Sen. Taft) ("Each branch of the Government has a duty and responsibility to uphold the Constitution.").

The debates do not suggest how HEW is to avoid funding a school district which refuses to adopt a busing remedy that HEW believes the Constitution requires. Nor did Congress explain whether HEW should have the authority to accept a nontransportation desegregation plan from a school district of this sort.

**39.** *E. g.*, 123 Cong.Rec. S10901 (daily ed. June 28, 1977) (remarks of Sen. Eagleton). Senator Biden supported his own amendment with the view that HEW should have "absolutely no input whatsoever with regard to any order of a court." 121 Cong.Rec. 30359 (1975). Although he claimed his amendment and the Byrd Amendment would have the same effect, Senator Biden's remark should bear limited weight as his own amendments were ultimately dropped from the bill.

**40.** *E. g.*, 123 Cong.Rec. H6050 (daily ed. June 16, 1977) (remarks of Rep. Mottl); 121 Cong. Rec. 30358 (1975) (remarks of Sen. Biden).

**41.** Senator Johnston, for example, said that HEW, under the Byrd Amendment, would not be able to use the threat of fund-termination "to encourage or require or cajole the school board into accepting a busing plan." 121 Cong.Rec. 30362 (1975). No one, during any of the debates, discussed the similar use of a threat of referral to the Department of Justice.

outstanding from earlier proceedings in this case.[42]

### D. *Opinion by the District Court*

Appellants contended in the district court that the amendments impermissibly interfere with the two civil rights enforcement concepts introduced respectively, in *Brown v. Board of Education, supra,* and *Cooper v. Aaron, supra.* They claimed both that the amendments inhibit desegregation and that they cause the federal government to provide support for segregated public education. Judge Sirica for the district court rejected both claims insofar as they attack the amendments on their face, not as applied.[43] First he found no impermissible inhibition of desegregation because the amendments do not bar either local or federal action to desegregate the schools as required by *Brown v. Board of Education, supra,* and to adopt a transportation plan if necessary. Judge Sirica distinguished the instant case from *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), a case relied on by appellants, because the instant case does not involve a flat prohibition against involuntary busing.[44] The amendments challenged here merely restrict one federal agency's ability to induce busing as a condition of receiving federal funds.

Local school officials still may voluntarily employ transportation to desegregate, HEW can refer cases to the Department of Justice for litigation, and private suits may be brought. Thus, the court concluded, all reasonable desegregation methods remain available to school officials and to courts.

Judge Sirica similarly found the availability of other desegregation options dispels appellants' second objection. Through desegregation litigation brought by the Department of Justice, the government can avoid supporting illegal discrimination, as prohibited by *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958); *Kelsey v. Weinberger,* 162 U.S.App.D.C. 159, 167–168, 498 F.2d 701, 709–10 (D.C. Cir. 1974), and similar cases.[45] Judge Sirica observed that the litigation would avoid unconstitutional governmental support by assuring that recipients comply with the law.[46] He rejected the claim that litigation would be less rapid than fund termination because the administrative procedures for fund termination are themselves "cumbersome" and time-consuming.[47]

Central to the district court's conclusion was its view that "neither [amendment] operates by its express terms to foreclose the availability of remedies that may be necessary to guarantee federal rights in

---

42. Rep. Flood explained that the Byrd Amendment "simply limits the discretion of the Secretary of HEW in choosing methods to carry out his enforcement of the law." 122 Cong.Rec. 20409 (1976). The previous order in this case directed HEW to pursue enforcement in 46 districts. *Brown v. Califano,* No. 75–1068, Memorandum and Order (D.D.C. July 20, 1976), 13–14.

Plaintiff-appellants here argue that HEW has continued to provide federal funds to some 14 districts, despite the order. Reply Br. at 2. They cite the Deposition of David Tatel, HEW Director for Civil Rights, as evidence that HEW has "settled or dismissed" its proceedings against seven districts in which it found de jure segregation "because the Esch or Byrd Amendments precluded HEW from requiring the busing remedy needed to achieve desegregation." *Id.* (citing J.A. 18–19, 36–37, 116).

43. Memorandum Opinion, J.A. 12–13.

44. *Id.* at 8–9.

*Swann* involved a state statute prohibiting student assignment on the basis of race, religion, or national origin and barred the use of public funds for "[i]nvoluntary bussing." 402 U.S. at 45 n. 1, 91 S.Ct. at 1285. The Court in *Swann* held that:

. . . the flat prohibition against assignments of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems.

*Id.* at 46, 91 S.Ct. at 1286.

45. *E. g., Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971), 503 F.2d 930 (7th Cir. 1974), aff'd sub nom. *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). *See Green v. Connally,* 330 F.Supp. 1150, 1164 (D.D.C.1971), aff'd sub nom. *Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).

46. Memorandum Opinion, J.A. 11.

47. *Id.* at 11–12.

given instances."[48]   The court explicitly noted it would entertain attacks on the provisions as applied, if further proceedings show the litigation option is not a "workable instrument for effecting equal educational opportunities."[49]

## II. THE AMENDMENTS AND EFFECTIVE DESEGREGATION ENFORCEMENT

█   The amendments here at issue make no classification along impermissible lines, but that does not prevent an equal protection challenge.[50]   Interference with the remedies necessary to implement the promise of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), could well rise to the level of impermissible discriminatory effect and purpose.[51]   In essence, that is appellants' claim here.   Appellants argue that, by restricting HEW's ability to require busing remedies, the amendments demonstrate discriminatory intent to interfere with desegregation.   Presumably, this claim attaches to HEW's statutory obligation under Title VI to achieve equality in federally-funded schools and to the Executive's duty to "take care that the Laws [are] faithfully executed."[52]

Thus, appellants assert that the amendments, by their plain terms, effect and purpose, violate the fifth amendment by eliminating "the single, proven, and most effective remedy for desegregating schools receiving federal aid."[53]   There are actually two prongs to this claim: the amendments will effectively inhibit desegregation and thereby dilute the guarantees of the fifth amendment; and the amendments reflect an impermissible legislative motivation to inhibit desegregation.   Because the amendments on their face leave open many apparently effective avenues for desegregation, we are not persuaded by either argument.

### A.   Construing the Amendments

The traditional judicial practice of reaching statutory issues before constitutional ones,[54] combined with deference to Congress, supports application here of the general rule that legislation "should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts."[55]   The amendments can be interpreted here to advance a permissible purpose, with no general inhibition of desegregation.[56]   Although individual supporters broadly attacked busing as a desegregation remedy,[57] we do not find these statements

**48.** *Id.* at 12.   Judge Sirica treated the Esch and Scott-Mansfield Amendments as one, and the Byrd and Eagleton-Biden Amendments as a unit.   As the Eagleton-Biden provision is the most restrictive, the most explicit, and the most recent, this court focuses analysis on it. *See* n. 27 *supra.*

**49.** Memorandum Opinion, J.A. at 12.

**50.** *Cf. North Carolina State Board of Education v. Swann,* 402 U.S. 43, 45–46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971) (apparently neutral, color blind prohibition against student assignment on the basis of race, read against background of segregation, "would render illusory the promise of *Brown v. Board of Education,* 347 U.S. 483, [74 S.Ct. 686, 98 L.Ed. 873] (1954)").

**51.** *Id.*

**52.** U.S.Const. art. II, § 3.

**53.** Appellants Br. at 8.   Appellants thus launch the difficult claim that the amendments are discriminatory in impact and purpose despite seeming neutral.

**54.** *E. g., Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**55.** *Lynch v. Overholser,* 369 U.S. 705, 711, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962). *Accord: United States v. National Dairy Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); *United States v. Thompson,* 147 U.S.App.D.C. 1, 5, 452 F.2d 1333, 1337 (D.C. Cir. 1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

**56.** This court intimates no approval of the amendments should they in practice inhibit desegregation.   The court also expresses no view on their constitutionality should the amendments be shown to prevent or delay a transportation remedy for a particular district.   Such a showing should arise in the context of a particular district requiring such a remedy.

**57.** The Esch Amendment expressly sought to prohibit all busing remedies, even if ordered by a court.   120 Cong.Rec. 8265 (1974) (remarks of Rep. Esch); 120 Cong.Rec. 14911 (1974) (re-

expressive of the entire legislature's intent. Were they representative, we would be confronted with grave constitutional difficulties. Instead, we recognize the primary focus of the congressional debates on the role of HEW as an enforcement agency. An explicit, major purpose of the amendments was to take "HEW out of the busing business." [58] In other words, Congress wanted to ensure that mandatory busing orders derive either from local school officials or federal courts.[59]

Accordingly, the amendments only restrain HEW from using its fund-termination authority to induce school districts to require student transportation beyond schools closest to their homes.[60] They do not in any way restrict HEW's authority to threaten or actually terminate funds with respect to any other desegregation remedy which would suffice.[61] Thus, HEW can reject fund applications which fail to provide for magnet schools,[62] faculty desegregation, school construction or school closings that enhance desegregation, or other nontransportation remedies it deems necessary for compliance with Title VI and the Constitution.

For those noncomplying school districts which HEW believes require transportation remedies, the amendments clearly eliminate use of the fund-termination op-

marks of Sen. Gurney, Senate sponsor of Esch Amendment). *See* note 26 *supra.* A measure with that effect is clearly unconstitutional in light of *Swann v. Charlotte-Mecklenburg Board of Educ.,* 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971) (rejecting state prohibition against student assignment and busing where needed to achieve racial balance). But the Esch Amendment was modified before enactment by the Scott-Mansfield provision. The Scott-Mansfield language clarifies that Congress did not intend to interfere with the judicial obligation to uphold the Constitution—nor with its power to order relief it deems required. 120 Cong.Rec. 15078 (1974) (remarks of Sen. Scott).

Supporters of the Byrd and Eagleton-Biden Amendments at times expressed broad intentions of banning involuntary busing as a desegregation remedy. They did so in the name of preserving neighborhood schools, *e. g.,* 121 Cong.Rec. 38176 (1975) (remarks of Rep. Bauman); promoting safety, *e. g.,* 123 Cong.Rec. H6052–53 (daily ed. June 16, 1977) (remarks of Rep. Broomfield); and cutting energy costs, *e. g.,* 121 Cong.Rec. 30036 (remarks of Sen. Byrd). These purposes have sometimes thinly hidden opposition to desegregation or equal educational opportunity. Standing alone, however, they do not clearly impugn the legislative motivation behind the amendments which themselves do not ban busing.

More problematic, as the government concedes, are the remarks of Senator Byrd. He supported his amendment with arguments for reversing the series of federal judicial decisions that permit desegregation through student assignment to achieve racial balance. 121 Cong. Rec. 30035–36 (1975) (remarks of Sen. Byrd) (criticizing *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir. 1966) (en banc), *Green v. New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and *Swann, supra* ). Despite his es-

poused position, Byrd proposed his amendment to narrow the Biden Amendment, which would have precluded student assignment based on race, and which was eventually dropped by the Conference Committee. *See* note 26 *supra.* This legislative history, combined with the actual language of the Byrd Amendment and its successor, the Eagleton-Biden Amendment, buttresses our presumption that Congress did not intend the unconstitutional aims of preventing racial assignment as a desegregation remedy or halting desegregation.

**58.** 122 Cong.Rec. 21198 (1976) (remarks of Sen. Biden) (regarding intention of Byrd Amendment passed in 1975). *Accord*: 121 Cong.Rec. 29811 (1976) (remarks of Sen. Eagleton); 121 Cong.Rec. 29813 (1976) (remarks of Sen. Byrd); 123 Cong.Rec. H6045 (daily ed. 1977) (remarks of Rep. Mottl).

**59.** 123 Cong.Rec. H6049 (daily ed. June 16, 1977) (remarks of Rep. Coleman) (reserve to local officials); 123 Cong.Rec. S10898, S10901 (daily ed. June 28, 1977) (remarks of Sen. Eagleton) (reserve to courts); 122 Cong.Rec. 21198 (1976) (remarks of Sen. Biden) (same).

**60.** *See* p. —— of 201 U.S.App.D.C., p. 1227 of 627 F.2d, *supra.*

**61.** *See* p. —— of 201 U.S.App.D.C., p. 1228 of 627 F.2d and n. 37, *supra.* If termination is sought, HEW must first seek voluntary compliance, and then follow termination procedures as required by Title VI and applicable regulations. *See* p. —— of 201 U.S.App.D.C., p. 1225 of 627 F.2d and nn. 21 & 22, *supra.*

**62.** Magnet schools are schools that attract voluntary student enrollments by offering special or enriched curriculae and programs.

tion to induce busing.[63] At the same time, nothing in their language or legislative history impairs two HEW activities in this context. First, the agency still may negotiate with the noncomplying district to encourage adoption of a voluntary transportation plan.[64] The second activity is obvious. As the district court concluded, nothing in the amendments precludes HEW from referring such cases to the Department of Justice, with recommendations for appro-

priate legal action.[65] This option is especially meaningful, given the Department's historic role in civil rights enforcement,[66] its experience in helping to develop desegregation plans, and its authority to intervene in private suits as well as initiate enforcement actions.[67]

Appellants contest the sufficiency of this referral option by claiming that time-consuming litigation will impermissibly fore-

**63.** *See* pp. ———— of 201 U.S.App.D.C., pp. 1227–1228 of 627 F.2d, *supra.* Congress intended to prevent HEW from in any way using fund termination to produce a busing plan. *E. g.,* 120 Cong.Rec. 8522–23 (1974) (remarks of Rep. Ashbrook) ("The possibility that funds might be withdrawn is so threatening to local operations that compliance, normally voluntary, follows" without improving education.). The "special coerciveness" of the sanction has been linked to the magnitude of the potential loss and to the consolidation of grant and enforcement functions in the same agency. Fiss, *The Fate of An Idea Whose Time Has Come: Antidiscrimination Law in the Second Decade after Brown v. Board of Education,* 41 U.Chi.L. Rev. 742, 756–58 (1974).

**64.** Voluntary compliance was the method most obviously encouraged by Title VI and HEW's regulations. *See* pp. ———— of 201 U.S.App. D.C., pp. 1225–1226 of 627 F.2d, *supra.* This emphasis undoubtedly reflects the greater success of voluntary desegregation efforts. Although the amendments undeniably prevent HEW from threatening fund termination to induce a busing remedy, nothing in the legislative history suggests that HEW cannot otherwise participate in negotiations with such a district. Congress expressly wished HEW to retain its role in encouraging voluntary compliance even after the passage of the amendments. *See* p. —— of 201 U.S.App.D.C., p. 1228 of 627 F.2d and n. 40, *supra.* Voluntary desegregation plans, or plans which obtain substantial community support, have a greater chance of creating the atmosphere conducive to improved minority academic achievement. School Desegregation: Making It Work (R. Green ed. 1976). *Cf.* Levin, *School Desegregation Remedies and the Role of Social Science Research,* 42 Law & Contemp. Problems 1, 29 (1978) (courts opt for magnet school plans "on evidence that magnet schools had met with some success in drawing white students"). Moreover, plans supported by the community minimize the kind of opposition that puts children physically and psychologically at risk. *See* Bell, *Waiting on the Promise of* Brown, 1975 Law & Contemp. Problems 341, 349.

**65.** Memorandum Opinion, J.A. at 5.

**66.** Fiss, *supra* note 63 at 754.

**67.** 20 U.S.C. § 1708 (1976) (Attorney General may intervene in suits brought by individuals denied equal educational opportunities); 20 U.S.C. § 1706 (1976) (Attorney General may institute civil action on behalf of individual denied equal educational opportunities).

The Attorney General also may bring suit to enforce the assurances of compliance provided by a school district. *E. g., United States v. Tatum Independent School Dist.,* 306 F.Supp. 285, 288 (E.D.Tex.1969) (United States authorized under Title VI, 45 C.F.R. 80.8, and its own authority to enforce terms and conditions upon which money allotments); *United States v. Frazer,* 297 F.Supp. 319 (D.Ala.1968) (same). We disagree with the contrary view of a district court in the 5th Circuit that the Department of Justice has no standing to seek enforcement of federal fund recipients' assurances of nondiscrimination. *See United States v. Marion County School District, No. 78–22–Civ.–Oc* (78–1864) (M.D.Fla. Aug. 11, 1978). The same court correctly ruled that the Department of Justice has standing to enforce the guarantees of equal protection, as embodied in Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6 (1976). The executive's authority to bring suits on behalf of private citizens should be most certain where necessary to protect individual constitutional rights. *See* Note, *Protecting the Public Interest: Nonstatutory Suits by the United States,* 89 Yale L.J. 118 (1979).

The recent district court decision dismissing a Department of Justice suit to enjoin violations of constitutional rights by the Philadelphia police department poses no obstacle to suits challenging discriminatory use of federal funds. *See United States v. City of Philadelphia,* 482 F.Supp. 1248 (E.D.Pa., dismissed in part for lack of standing, Oct. 29, 1979). That district court retained jurisdiction on the aspect of the complaint alleging discrimination in federally funded programs. *Id.*

stall the requisite remedy.[68] This is an issue which clearly requires concrete development, and is not susceptible to resolution in the abstract. We cannot agree with the district court that litigation promises "great if not greater promptness" than fund-termination by the agency.[69] Yet it is possible that litigation could conceivably stretch no longer or not much longer than the time period required by the administrative alternative. Thus, as a facial challenge to the amendments, appellants' argument cannot succeed. Further, the Department of Justice is not limited to a litigative strategy; it may conduct negotiations and seek settlements, where appropriate.

Finally, the Department is under a strict obligation to avoid delay. To avoid constitutional doubts, we must proceed on the assumption that Congress intended the Department of Justice to act with the greatest dispatch. Otherwise the amendments may be seen as a tool of delay to avoid dismantling unconstitutionally segregated school systems. The courts no longer countenance "all deliberate speed" as the time-frame for dismantling unconstitutionally segregated school systems. Instead, "the obligation of every school district is to terminate dual school systems at once."[70]

This obligation to guard against delay applies with equal force to HEW when it seeks to procure compliance. The government argues that the amendments do not prevent HEW from threatening referral to the Department of Justice in order to increase HEW's leverage in persuading offending districts to "voluntarily" reassign students.[71] We agree, with this proviso: HEW cannot delay in taking necessary steps to bring about compliance. In *Adams v. Richardson*, the district court held with our approval that if HEW fails "during a substantial period of time to achieve voluntary compliance, [it has] a duty to commence enforcement proceedings."[72] In sum, HEW referral to the Department of Justice for action must not be hindered by delays due to either agency.[73]

### B. *Dilution of Equal Protection Guarantees*

The amendments would be constitutionally flawed if they diluted rather than enforced equal protection guarantees.[74] As construed, however, these amendments do not pose this problem. We concluded above that these amendments do not preclude the threat of fund-termination for non-complying districts except if deployed to induce a busing remedy. With that exception, HEW

---

**68.** Appellants' Br. at 16, Appellants Reply Br. at 6.

**69.** Memorandum Opinion at J.A. 12.

**70.** *Alexander v. Holmes County Board of Educ.*, 396 U.S. 19, 20, 90 S.Ct. 29, 29, 24 L.Ed.2d 19 (1969). *See Griffin v. County School Bd.*, 377 U.S. 218, 234, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964); *Gross v. Board of Educ.*, 373 U.S. 683, 689, 83 S.Ct. 1405, 1409, 10 L.Ed.2d 632 (1963).

**71.** Government Br. at 7.

**72.** 356 F.Supp. at 94 (finding two-year period too long). In affirming Judge Pratt's finding, this court concluded:

Although the Act does not provide a specific limit to the time period within which voluntary compliance may be sought, it is clear that a request for voluntary compliance, if not followed by responsive action on the part of the institution within a reasonable time, does not relieve the agency of the responsibility to enforce Title VI . . . . A con-

sistent failure to do so is a dereliction of duty reviewable in the courts.
480 F.2d at 1163 (footnote omitted).

**73.** This is the single HEW corrective option when the agency concludes a district's noncompliance can be cured only by a transportation remedy. Private suits and suits initiated by the Attorney General remain, however, as avenues to challenge and remedy denials of equal educational opportunity or equal protection in the schools. In addition, a private individual could challenge in court HEW's continued funding of a noncomplying district.

**74.** *See Katzenbach v. Morgan*, 384 U.S. 641, 651 n. 10, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966). Although *Katzenbach* concerned a congressional enactment (§ 4(e) of Voting Rights Act of 1965) under the 14th amendment, the same principle would apply to congressional action seeking to restrict the scope of fifth amendment due process. *See Bolling v. Sharp*, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

can still use this enforcement tool which appellants characterize as "the single most effective remedy for desegregating schools receiving federal aid." [75] As the amendments also leave in place the enforcement options at the Department of Justice, we cannot find that on their face they "restrict, abrogate, or dilute" the guarantee of equal protection. [76] Where a choice of alternative enforcement routes is available, and the one preferred is not demonstrably less effective,

Congress has the power to exercise its preference. [77]

### C. Legislative Motivation

■ Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable. [78] Obviously, the foreseeable effect [79] of these amendments is increased litigation for court-ordered desegregation, and settlements supervised by HEW and the courts—

75. Appellants Br. at 19. Appellants cite similar views of President Carter, Secretary Califano, the U.S. Commission on Civil Rights and the Attorney General, all lauding the effectiveness of fund-termination to expedite federal enforcement of equal protection guarantees. *Id.* at 19–25. The government concedes that the amendments' restriction on this enforcement tool is "a bad idea." Appellee's Br. at 44 n. 27; *see* Memorandum Opinion at 6. But, as the government also notes, "bad ideas are not automatically unconstitutional." Appellee's Br. at 44 n. 27.

76. *Katzenbach v. Morgan, supra* 384 U.S. at 651 n. 10, 86 S.Ct. 1724 n. 10. As the Supreme Court noted, a state legislature lacks power to authorize racial segregation in public schools for that "would not be—as required by § 5 [of the 14th amendment]—a measure 'to enforce' the Equal Protection Clause." *Id.* Similarly, a congressional enactment banning all government enforcement options would not be authorized by the "necessary and proper clause" of the fifth amendment.

Senator Taft warned that the Esch Amendment would amount to such an unconstitutional ban of governmental corrective action. "The right would be nullified if there is no effective remedy to vindicate it, which certainly would be the situation in certain cases" where HEW could not require busing. 120 Cong.Rec. 14912 (1974). The Scott-Mansfield modification of the Esch Amendment, and this court's interpretation of the other amendments, assures that remedies remain for unconstitutional deprivation through prompt court suits, if not through HEW action.

77. *See Katzenbach v. Morgan, supra* at 654–56, 86 S.Ct. at 1725–26 (Congress' prerogative to legislate so as to preclude enforcement of state English literacy requirement for voting).

78. The courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968). This rule is supported here by deference to a co-equal branch and recognition of the difficulties in proving intentions behind four amendments spanning three years. *See* note 26, *supra.*

There is, however, a certain anomaly in applying this rule to an equal protection claim. Recent Supreme Court cases have made clear that proof of discriminatory intent, not just disproportionate impact, is necessary to establish an equal protection violation of constitutional dimensions. *E. g., Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–44, 96 S.Ct. 2040, 2059, 48 L.Ed.2d 597 (1976). Impact alone may be inconclusive where, as here, legislation is challenged on its face. The Court has acknowledged that in some circumstances, impact alone may suffice as the critical factor to trigger strict scrutiny. *Washington v. Davis, supra,* 426 U.S. at 242–43, 96 S.Ct. at 2048–49 (discussing *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) and *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972)). We find that the foreseeable impact of the amendments is not discriminatory. *See* p. —— of —— U.S.App.D.C. 1235 of 627 F.2d, *infra.* Absent proof of disproportionate impact, we refrain from further investigation into the historical background and legislative history to unearth illegitimate intent. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* 429 U.S. at 266–68, 97 S.Ct. at 563–65 (describing sources of inquiry for equal protection challenge).

Even if further consideration of intent were required, a review of the dominant purposes of the legislation would suffice. *See Washington v. Davis, supra* at 243, 96 S.Ct. at 2049 (construing *Palmer v. Thompson* ). We have found that the amendments were tailored to the permissible purpose of removing HEW authority to order busing without disturbing the authority of courts and local officials to promptly require student transportation.

79. A threshold showing of impermissible motivation may well draw on objective proof of the legislation's foreseeable effect, just as the foreseeable effect of school board action may be used as evidence of intent. Note, *Segregating Schools: The Foreseeable Consequences of Tuition Tax Credits,* 89 Yale L.J. 168 (1979). *Cf. Personnel Adm'r of Massachusetts v. Feeney,*

not unremedied segregation.[80] Thus, statements by individual congressmen that reveal opposition to busing or to student assignment to achieve desegregation,[81] do not by themselves establish constitutional flaws in the amendments.[82]

## III. PROHIBITION AGAINST GOVERNMENT SUPPORT FOR SEGREGATION

More problematic is appellants' charge that the amendments interfere with the government's obligation not to support segregated schools.[83] The Constitution's prohibition against governmental support of schools practicing invidious discrimination is too obvious and well-established to require elaboration here.[84] Distinct from its duty to enforce the law, the Executive must not itself participate in unlawful discrimination. This prohibition is embodied in Title VI and in numerous subsequent statutory schemes.[85] To avoid the cloud of

442 U.S. 256, 99 S.Ct. 2282, 2296 n. 25, 60 L.Ed.2d 870 (1979) (discriminatory intent may be inferred from foreseeable impact of statute).

**80.** This result was also foreseen by some members of Congress. *See, e. g.,* 121 Cong.Rec. 30542 (1975) (remarks of Sen. Humphrey).

**81.** *See* n. 57, *supra.* Such statements, of course, are contrary to the Supreme Court's continuing interpretation of what the Constitution requires. Even members of that Court who doubt the wisdom of busing acknowledge the continuing necessity that busing remains as a remedial option. As Chief Justice Burger recently observed,

It is becoming increasingly doubtful that massive public transportation really accomplishes the desirable objectives sought. Nonetheless our prior decisions have sanctioned its use when a constitutional violation of sufficient magnitude has been found. We cannot retry these sensitive issues in this Court; we can only set the general legal standards and, within the limits of appellate review, see that they are followed.

*Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 2952, 61 L.Ed.2d 666 (1979) (Burger, C. J., concurring in the judgment).

**82.** *See* p. —— of 201 U.S.App.D.C., p. 1231 of 627 F.2d. Coupled with evidence that the amendments as applied inhibit desegregation, such statements in the Congressional Record could bolster a future constitutional challenge.

**83.** Appellants' Br. at 38–43.

**84.** *See, e. g., Norwood v. Harrison,* 413 U.S. 455, 467, 93 S.Ct. 2804, 2812, 37 L.Ed.2d 723 (1973) ("A State's constitutional obligation requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination."); *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958) ("State support of segregated schools through any arrangement, management, funds, or property

cannot be squared" with the equal protection clause); *Kelsey v. Weinberger,* 162 U.S.App. D.C. 159, 498 F.2d 701 (D.C. Cir. 1974) (federal funds cannot support school system which has stopped discriminatory assignment of faculty but not remedied effects of past discrimination); *Adams v. Richardson,* 156 U.S.App.D.C. 267, 272, 480 F.2d 1159, 1166 (D.C. Cir. 1973) (en banc) (HEW's "general obligation not to allow federal funds to be supportive of illegal discrimination); The prohibition extends not only to financial aid, but also to any substantial government involvement in private, invidious discrimination. *E. g., Evans v. Newton,* 382 U.S. 296, 298, 301, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966) (forbidding racial discrimination in private park once under municipal trusteeship); *Anderson v. Martin,* 375 U.S. 399, 402, 84 S.Ct. 454, 455, 11 L.Ed.2d 430 (1964) (striking down state requirement of designation of candidates' race on ballot); *Lombard v. Louisiana,* 373 U.S. 267, 273, 83 S.Ct. 1122, 1125, 10 L.Ed.2d 338 (1963) (prohibiting state enforcement of private segregation in restaurant).

**85.** *See* Fiss, *supra* note 63, at 756 ("Fund termination was first viewed not as a sword, but as a shield against government participation in discriminating activities.") Congress has authorized fund termination to steer federal money away from impermissible discriminatory use in a wide range of contexts. *E. g.,* 42 U.S.C. § 6709 (public work employment) (1976); 42 U.S.C. § 6870 (energy conservation) (1976); 49 U.S.C. § 1608(f) (urban mass transportation) (1976).

Of course, funds cannot be denied or terminated until procedural requirements are met, *e. g.,* 45 C.F.R. Parts 80, 81 (1979) (HEW procedures); *see* pp. ——–—— of 201 U.S.App.D.C., 1224–1225 of 627 F.2d, *supra.* The government claims that the amendments here at issue are similar, permissible procedural limits on executive civil rights enforcement. Appellee's Br. at 34–35. The district court, however, correctly observed that the amendments cause an obvious change in the executive's options for assur-

constitutional doubt, we must assume that Congress did not intend the amendments to force federal financial support of illegal discrimination.[86]

■ Thus, the amendments cannot be read to prevent HEW from fulfilling its obligation to assure no federal moneys support segregated schools. HEW has an obligation, as a government agency, not to participate in unlawful discrimination.[87] In particular instances, HEW may be required

to 1) refer a case to the Department of Justice for appropriate action;[88] 2) terminate funds through HEW's administrative procedures;[89] or 3) alert the President that a case may require Executive impoundment of funds.[90] Appellants and other private individuals certainly are not barred from challenging HEW's failure to take any such steps.

■ The record in this case raises the issue of whether the amendments in fact

ing aid flows only to proper recipients. Administrative fund-termination "directly results in severing financial ties with school systems that are willing to accept the loss of federal support as the price for operating their schools" in violation of the Constitution. Memorandum Opinion, J.A. at 11. Where the amendments preclude this option, the government only indirectly avoids support to noncomplying schools by seeking to bring them into compliance through Department of Justice litigation. Whether this change to an indirect method unconstitutionally burdens the government's obligation to avoid supporting segregated schools can be resolved only in the context of a concrete situation.

86. Congress was fully aware of this constitutional issue. E. g., 123 Cong.Rec. H6051 (daily ed. June 16, 1977) (remarks of Rep. Edwards) (opposing Eagleton-Biden amendment on this ground); id. (remarks of Rep. Echkardt) (same); 121 Cong.Rec. 30543 (1975) (remarks of Sen. Humphrey) (opposing Byrd Amendment because of this constitutional risk). President Carter was also alert to the constitutional problems posed by the Eagleton-Biden Amendment. Statement by the President, Dec. 9, 1977, reprinted in Appellants' Br. at Appendix C, 4.

87. Hills v. Gautreaux, 425 U.S. 296, 297, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976) (Department of Housing and Urban Development violated fifth amendment and Title VI by knowingly funding racially discriminatory public housing program).

88. See pp. ——, —— of 201 U.S.App.D.C., pp. 1225, 1232 of 627 F.2d, supra. The Department of Justice must pursue such referrals with urgency especially when the issue is termination, not an initial grant of funds.

89. See p. —— of 201 U.S.App.D.C., pp. 1231–1232 of 627 F.2d, supra. The government argues that the amendments merely replace eventual judicial review of HEW action with initial resort to the courts for districts which HEW believes need a transportation remedy. Appellee's Br. at 31 & 31 n. 18. As construed by this court, the amendments clearly permit initial HEW evaluation of a district's compliance with its

assurance of nondiscrimination as required by Title VI and the Constitution.

We also conclude that the amendments preclude HEW use of its fund-termination authority to induce a busing remedy. HEW nonetheless retains authorization to initiate its administrative proceedings if busing is only one of multiple possible remedies for a noncomplying district. As long as HEW clarifies that it is not using the fund-termination to require busing, it should be able to pursue other remedies through administrative action. The agency is better situated than the court to decide in the first instance how to proceed where more than one option is present. See Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., 360 U.S. 411, 420, 79 S.Ct. 1210, 1216, 3 L.Ed.2d 1334 (1959).

90. The President's authority to impound funds derives from his duty to "take care that the laws [are] faithfully executed," article II, § 3 of the Constitution, and from specific statutory provisions. Impoundment takes on special importance where the Executive believes the expenditure would violate a constitutional provision. See Krantz, A 20th Century Emancipation Proclamation: Presidential Power Permits Withholding of Federal Funds from Segregated Institutions, 11 Am.U.L.Rev. 48 (1962); Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making, 43 N. Carolina L.Rev. 503, 533–34, 544 (1965). Title VI bolsters the Executive's authority to ensure that federal funds do not flow to impermissibly segregated school systems.

Although subject to congressional limits, see Kendall v. United States, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838) (postmaster-general cannot deny payment expressly provided by Congress); Congressional Budget and Impoundment Control Act of 1974, 31 U.S.C. §§ 1403, 1404 (1976), the President retains the authority to impound or defer funds, consistent with the purposes of the particular program and subject to judicial review. See Abascal & Kramer, Presidential Impoundment Part II: Judicial and Legislative Responses, 63 Geo.L.J. 149 (1974). Cf. Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 635–37, 72 S.Ct. 863, 870–71, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

permit HEW to discharge its obligation to assure that no funds are used by districts it has found out of compliance. At the time of the most recent affidavit submitted in this case, HEW was merely planning to or thinking about referring cases to the Department of Justice for enforcement.[91] *See* Appendices A & B. Thus, from the record, we have no evidence that HEW has taken steps to avoid participation in unlawful segregation. We agree, however, with the district court that the record does not establish sufficient factual evidence to permit a review of the amendments as applied.[92]

**91.** Affidavit of Cynthia Brown, Acting Director, Office of Civil Rights, February 28, 1978, J.A. 38–42. In an earlier statement, David Tatel, Director of the HEW Office of Civil Rights admitted that HEW was funding segregated school systems. Deposition of David Tatel, July 28, 1977, J.A. 19; Affidavit of David Tatel, July 31, 1977, J.A. 36–37. The government claims that in each district cited, HEW "was either able to negotiate acceptable desegregation plans or intended to refer the case to the Department of Justice if dissatisfied with the local authorities' actions." Appellee's Br. at 12. The government relied on the Affidavit of Cynthia Brown, *supra.* We cannot be confident on this basis that the amendments permit HEW to discharge its obligation to assure federal funds do not flow to unconstitutionally segregated districts.

Director Tatel identified eight districts which HEW found in violation of the 14th amendment but which continue to receive federal funds as HEW settled or dismissed action without attaining a busing remedy. Deposition of David Tatel, July 28, 1977, J.A. at 19, Affidavit of David Tatel, July 31, 1977, J.A. at 36–37. (Springfield, Ohio; Joliet, Illinois; Jones County, Missouri; Fresno, California; Gulfport, Missouri; Madison County, Georgia; Anne Arundel, Maryland; and Frederick County, Maryland.) Explaining HEW's progress in these cases six months later, Acting Director Brown noted that five "have taken substantial voluntary steps to eliminate racial isolation in their schools, yet sufficient doubt as to the adequacy of these remedies remains to justify our giving these districts further consideration for possible referral." Affidavit of Cynthia Brown, Feb. 28, 1978, J.A. at 40. (Springfield, Ohio; Joliet, Illinois; Fresno, California; Anne Arundel, Maryland; and Frederick County, Maryland.) Thus, the record on appeal reveals no HEW action to stop funding these districts which it believes to be in violation of the Constitution. *See generally* Appendix A *infra.*

In response to questioning, Tatel also identified nine "pending or active cases where HEW has found that the district has segregated

Therefore, we affirm the district court's judgment that the amendments survive facial challenge. We assume that the district court retained jurisdiction to entertain further motions challenging HEW's actions under the amendments[93] and we affirm.

*Affirmed.*

## APPENDIX A

| Cases settled or dismissed although violation found; HEW precluded from requiring transportation.* | Status as of Feb. 28, 1978 ** |

schools in violation of the Fourteenth Amendment" and where the amendments preclude HEW from requiring "the only effective remedy, transportation of students beyond the nearest or second nearest school." Deposition of David Tatel, July 28, 1977; Affidavit of David Tatel, July 31, 1977, J.A. at 19. (Lima, Ohio; Kansas City, Missouri; Maywood, Illinois; Flint, Michigan; Saginaw, Michigan; Marion County, Florida; Baltimore City, Maryland; Vance County, North Carolina; Marshall, Texas.) Five of these resulted in findings by administrative law judges of constitutional violations. HEW accepted a negotiated plan in Kansas City, Missouri, and Brown said that preliminary steps were taken "in preparation for the referral" of the other four to the Department of Justice. Affidavit of Cynthia Brown, Feb. 28, 1978, J.A. at 40. (Lima, Ohio; Flint, Michigan; Marion County, Florida; Marshall, Texas.) Similarly, Brown reported HEW's preliminary determination that the Maywood, Illinois case "should be prepared for referral." *Id.* at 40. The ultimate treatment of these five cases is not known to this court. *See generally* Appendix B *infra.*

Of course, a serious problem here is the length of time that has elapsed since this suit and the affidavits were filed. This unfortunate consequence of the nature of civil litigation should not shield from judicial review a fuller record on the agency's capacity under the amendments to observe constitutional requirements in the disbursement of federal funds.

**92.** Memorandum Opinion, J.A. at 7.

**93.** The district court has invited reopening the case "upon the application of any party should this Court's involvement become necessary." Order, July 18, 1978, No. 75–1068; *see* Memorandum Opinion, J.A. at 12–13 (inviting appellants' challenge to the amendments as applied). Neither this decision nor the consent decree and prior orders terminate this case. *See* note 1 *supra.*

| | |
|---|---|
| Springfield, Ohio | Voluntary steps taken, "yet sufficient doubt as to the adequacy of these remedies remains to justify our giving these districts further consideration for possible referral" |
| Joliet, Illinois | Same |
| Fresno, California | Same |
| Ann Arundel, Maryland | Same |
| Frederick County, Maryland | Same |
| Gulfport, Mississippi | "Preliminary determination": it "should be prepared for referral" |
| Madison County, Georgia | OCR to determine if referral is appropriate |
| Jones County, Missouri | Schools substantially racially balanced |

* Based on Deposition of David Tatel, July 28, 1977, J.A. at 19; Affidavit of David Tatel, July 31, 1977, J.A. at 36–37.

** Based on Affidavit of Cynthia Brown, Feb. 28, 1978, J.A. at 40.

## APPENDIX B

| Pending or active cases where HEW found 14th amendment violation but amendments preclude HEW from requiring only effective remedy, transportation beyond nearest school * | Status as of Feb. 28, 1978 ** |
|---|---|
| Lima, Ohio | ALJ found violation; in preparation for referral |
| Flint, Michigan | Same |
| Marion County, Florida | Same |
| Marshall, Texas | Same |
| Kansas City, Missouri | ALJ found violation; HEW accepted negotiated plan |
| Maywood, Illinois | "Preliminary determination": it "should be prepared for referral" |
| Saginaw, Michigan | Adverse finding by ALJ |
| Baltimore City, Maryland | Litigation in court |
| Vance County, North Carolina | Settled on the basis that the student assignment meets constitutional requirements |

* Based on Deposition of David Tatel, July 28, 1977, J.A. at 19; Affidavit of David Tatel, July 31, 1977, J.A. at 36–37.

** Based on Affidavit of Cynthia Brown, Feb. 28, 1978, J.A. at 39–40.